COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present: Judges Beales, Friedman and Callins
Argued at Leesburg, Virginia


MUMEET MUHAMMAD, S/K/A
  TONIE MACKLIN

                                                     MEMORANDUM OPINION* BY
v.        Record No. 1910-22-4                       JUDGE DOMINIQUE A. CALLINS
                                                     JUNE 11, 2024

COMMONWEALTH OF VIRGINIA


                FROM THE CIRCUIT COURT OF ARLINGTON COUNTY
                         Daniel S. Fiore, II, Judge

          Helen Randolph, Assistant Public Defender II (Mark S. Thrash, on
          brief), for appellant.

          Collin C. Crookenden, Assistant Attorney General (Jason S. Miyares,
          Attorney General, on brief), for appellee.


       A jury trial convicted Mumeet Muhammad of aggravated malicious wounding, use of a

firearm in the commission of aggravated malicious wounding, and two counts of abduction. On

appeal, Muhammad argues that the trial court erred by (1) finding a proper chain of custody to

admit ballistics evidence and testimony, (2) denying the motion to suppress his statements made to

police, (3) finding the evidence sufficient to support his convictions for aggravated malicious

wounding and abduction, (4) denying his jury instruction regarding the use of excessive force by

police, and (5) admitting the 911 call into evidence. For the following reasons, we affirm the

judgment of the trial court.

---

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

BACKGROUND[1]

I. The Incident at National Waste

After ending a romantic relationship with Muhammad, Lawanda Washington traveled to California for vacation. Muhammad repeatedly texted and called Washington during her vacation. She became weary of the incessant contacts and ultimately had a male friend answer one of Muhammad's calls. Afterward, Washington received a barrage of heated texts from Muhammad before he finally "calmed down." Muhammad later called Washington's daughter and told the daughter that "he was go[ing to] mess [Washington's] life up."

When Washington returned to work following her vacation, Muhammad resumed sending her multiple text messages. Eventually, Muhammad showed up at Washington's workplace, National Waste and Recycling Association ("National Waste"). When she saw him, Washington jumped up from her desk and ran out of her office toward Muhammad, who was retrieving an item from his backpack. As she drew near, Muhammad began screaming "something" before beating her in the face with a gun. Washington sustained two black eyes and a broken nose.

In another office in the same suite, two of Washington's co-workers hid under their desks. Both co-workers called 911.[2] Anne Germain, another of Washington's co-workers, went into Washington's office and attempted to intervene. Muhammad pointed his gun at Germain and told her to "get back in her mother[----]ing office." Germain obeyed Muhammad's directive and returned to her office.

---

[1] We recite the facts "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)).

[2] One 911 recording exhibit was played for the jury, which included the two calls from Washington's co-workers.

Still in Washington's office, Muhammad pointed his gun at Washington's head and "a shot fired." According to Washington, Muhammad pointed the gun above her head and then downward just before firing, causing the bullet to hit the floor. Washington then ran to Germain's office. Although she tried to close the door behind her, Muhammad pushed his way inside. At that moment, Germain was on the telephone with emergency dispatch. Muhammad told Germain to get off the phone and ordered her to sit in a chair. Again, Germain obeyed Muhammad's command; she sat in a chair with her hands raised. Germain tried to "de-escalate the situation," but Muhammad remained upset; he continued to point the gun at Washington, who sought refuge under Germain's desk. Gesticulating with the gun, Muhammad yelled and cursed.

Arlington County Police Corporals John Clark and Kenneth Giles responded to the 911 calls from National Waste. Both the entry to the National Waste office suite and a visible wall to Germain's office were made of floor-to-ceiling glass panes. As he approached the suite, Corporal Clark observed Washington "crawling frantically under the desk" in Germain's office.

Once inside the suite, Corporal Clark approached Germain's office door and peered inside the office through the glass pane. Corporal Clark saw Muhammad raise his gun and point it at Corporal Clark, stating, "she did this." Fearing for his and others' lives, Corporal Clark drew his firearm and stepped away from the door. He fired five to ten shots through the office window before stepping into an adjoining office. There he watched as "at least two to three rounds fir[ed] through the wall approximately midway into the office [where Corporal Clark sought cover] and approximately a foot off the ground." Corporal Clark did not recall whether he identified himself as a police officer or otherwise gave any commands to Muhammad before firing his weapon.

At trial, Corporal Giles testified to his use of force during the incident at National Waste. Corporal Giles received use of force training almost every quarter. De-escalation is "not feasible," Corporal Giles, explained, when an officer is "met with deadly force." When presented with deadly

force, an officer must address the threat with the "appropriate level of force." Corporal Giles acknowledged that the use of a firearm is one example of deadly force. He testified that he observed Corporal Clark look inside Germain's office before stepping back, drawing his weapon, and yelling "drop the gun, drop the gun," prior to Corporal Clark firing.

Washington testified that she saw the police officers in the hallway and put her hands over her head. During the gunfire, she felt bullets enter her body. Washington sustained bullets to her right breast and right thigh, and bullet grazes to her right arm, right temple, and right shoulder.

After the gunfire ceased, police escorted Washington and Germain out of Germain's office. Muhammad, who suffered gunshot injuries to his left bicep and abdomen, was lying on the floor. To his right lay a small black semiautomatic handgun with no ammunition. Muhammad stated repeatedly, "she did it, she did it."

## II. Recovery and Testing of Evidence

Arlington County Police Detective Steven Roeseler processed the crime scene at National Waste. He first collected the firearms of Corporals Clark and Giles. He sealed Corporal Clark's Glock Model 17 firearm in an evidence box and put his initials on the tape to identify himself as the collecting officer. He also collected the Luger 9mm pistol that Muhammad used during the shooting and initialed the corresponding evidence box. Detective Roeseler gave each item of evidence a unique number and barcode. Each item was safely stored in a temporary property and evidence storage locker at the police station. Only authorized individuals had access to the storage lockers. These authorized individuals transported storage lockers to the Department of Forensic Science laboratory (the "lab"). The trial court admitted into evidence Detective Roeseler's request for laboratory examination form ("RFLE") listing the Glock and Luger firearms and 15 separate shell casings recovered from the crime scene and submitted to the lab for analysis.

Emergency responders transported Washington to George Washington University Hospital. Due to unrelenting pain caused by a bullet lodged in Washington's thigh,[3] attending physician Bruce Abell recommended surgery to remove the bullet. Dr. Abell removed the bullet from Washington's thigh and gave it directly to Arlington County Police Detective Martin Henretty, who waited outside the operating room. Dr. Abell also performed surgery to dislodge the bullet in Washington's breast, and again gave the recovered bullet to police.

Dr. Abell testified that although surgery was successful, and Washington healed, her scarring was permanent. He explained that upon removal of a bullet there remained an "inflammatory capsule" created when Washington's flesh responded to the bullet—a foreign body—"to sequester [the bullet] so that it doesn't cause more problems" to the body. Dr. Abell testified that the inflammatory capsule "is part of the scarring that goes on in a person's body after they've been shot" and that Washington would "have a scar forever . . . . Scars never go away." Dr. Abell also testified that Washington would "never have the same amount of mobility or flexibility in that area, and there will always be a scar on the skin."

Detective Henretty entered the bullet collected from Washington's thigh into a property and evidence storage locker. He then prepared an RFLE seeking submission of the bullet to the lab for analysis.

At trial, Officer Bridget Meyer, a master police officer with the Arlington County crime scene unit, described the process for transporting evidence from the property and evidence storage lockers to the lab. Upon request, an officer from the crime scene unit personally transports evidence to the lab and "sign[s] it over" to the custody of the lab. After the lab technicians complete their work, a crime scene unit officer returns to the lab to retrieve the tested evidence. The retrieving

---

[3] Although Dr. Abell testified to removing a bullet from Washington's hip, several witnesses, including Washington and Corporal Clark, as well as Washington's medical records introduced as a trial exhibit, indicate that the bullet was removed from Washington's thigh.

officer signs the evidence back into property and evidence storage using a tracking system. Officer Meyer testified that evidence is already packaged and sealed by the submitting officer before it is taken to the lab. In this case, Officer Keith Ahn took the evidence from the property and evidence storage to the lab. He also signed the RFLEs. At the time of trial, Officer Ahn was retired from the police department and living in Hawaii. Officer Meyer took custody of the evidence from the lab following analysis and returned it to property and evidence storage.

Bronwyn McMaster, a forensic scientist employed by the Virginia Department of Forensic Science laboratory, qualified as an expert in firearms identification, "a specific branch within the field of forensic science that is primarily concerned with determining whether a bullet or cartridge cas[ing] has been fired by a particular firearm." McMaster examined the cartridge casings to determine which, if any, were fired from the submitted firearms. Muhammad objected to McMaster's testimony regarding her conclusions, arguing that the Commonwealth failed to establish the chain of custody because no one from the lab was present to testify to receiving the evidence, and the submitting officer, Officer Ahn, was not present to testify that he did not alter the evidence. The trial court overruled the objection. McMaster testified that the bullet recovered from Washington's thigh, and 7 of the 15 cartridge casings recovered at the crime scene, were fired from Muhammad's weapon. McMaster memorialized her findings in two separate certificates of analysis which were admitted into evidence over Muhammad's objection.

III. Muhammad's Statements to Police

Approximately one week after the incident at National Waste, the hospital released Muhammad. At around 11:00 p.m. the following day, Detectives Henretty and Ortiz interviewed Muhammad after advising him of his Fifth Amendment rights. Muhammad agreed to speak with the detectives. He admitted to arriving at National Waste, Washington's workplace, with a gun. He told the detectives that he discharged his gun and that he told Germain to sit down.

In relaying his version of the events, Muhammad emphasized to the detectives that he wanted them to know of Washington's "wrongs."

During the interview, Muhammad's uninjured arm was secured to a desk by three pairs of handcuffs "daisy-chained" together. The detectives provided Muhammad with water and chips and allowed him to sit in a padded chair in a climate-controlled room. At the very beginning of the interview, Muhammad told the detectives that he was in excruciating pain from his recent surgery and complained that he had not had any pain medication since 6:30 p.m. the day prior. However, during the 2.5-hour interview, Muhammad did not indicate that he could not understand the detectives' questions, that he was experiencing any confusion, nor that he wanted to terminate the interview because of pain or fatigue. Rather, Muhammad "seemed comfortable" and was "calm, straightforward," and "fairly talkative." During the interview, he gestured with his injured arm, and at one point stood up to show the detectives "how certain things occurred."[4]

### IV.  Muhammad's Motions and Proposed Jury Instruction

Before trial, Muhammad moved to suppress the statements he gave the police. At a hearing on his motion, Muhammad testified that he suffered gunshot wounds to his left arm, his left abdomen, his right shoulder, and on the back of his head. He was transported to George Washington Hospital where he underwent "two surgeries, maybe three," and remained there for an entire week. Upon his release, the hospital failed to provide Muhammad with any pain medication and, instead, gave him a prescription for Oxycodone and Percocet to be filled by the jail. Muhammad argued that the detectives' lengthy questioning when he was in pain overbore his free will and rendered his statements involuntary and inadmissible.

The trial court viewed the recorded interview and considered the arguments of counsel before concluding that Muhammad "is not a man that demonstrate[d]" he was in so much pain that

---

[4] The interview was digitally recorded.

his will was overborne. The trial court saw "no issue with the interview" or Muhammad's condition and denied the motion. Selected portions of the interview were played for the jury at trial.

At the conclusion of the Commonwealth's evidence, Muhammad moved to strike; he renewed his motion at the conclusion of his own evidence. Muhammad argued that the evidence was insufficient on the charges of aggravated malicious wounding and of abduction of Germain. The trial court denied both motions.

Muhammad offered Jury Instruction D, which provides that a law-enforcement officer is prohibited from using deadly force unless it is "immediately necessary" to prevent "serious bodily injury or death." Muhammad claimed the instruction was relevant because the officers did not "de-escalate the situation." He argued that Washington ran at him and that his conduct was not malicious, but defensive or reactive. The trial court denied the instruction on the grounds that there was not "one scintilla of evidence to support" it.

The jury convicted Muhammad of aggravated malicious wounding, use of a firearm in the commission of aggravated malicious wounding, and two counts of abduction. Muhammad appeals.

ANALYSIS

I. Chain of Custody

Muhammad assigns error to the trial court's admission of McMaster's testimony about her findings regarding the firearm identification and of her certificates of analysis. He argues that the Commonwealth failed to establish a chain of custody for the firearms and casings collected at the scene and for the bullet recovered from Washington's thigh.[5] We disagree.

---

[5] Muhammad does not appear to dispute that the chain was properly established between the collection of the evidence and submission to property and evidence, nor does he appear to dispute that the chain was established between its submission to the lab and its return to property and evidence. He argues that the chain was broken at the time of transport from property and evidence to the lab. Thus, we narrow our analysis only to this part of the chain.

"The determination on a chain of custody challenge lies within the trial court's broad discretion and will not be overturned on appeal absent an abuse of that discretion." *Pope v. Commonwealth*, 60 Va. App. 486, 511 (2012). The purpose of establishing a chain of custody is to verify that the evidence obtained by the police is the same evidence tested and subsequently used at trial. *Brown v. Commonwealth*, 21 Va. App. 552, 555 (1996). The Commonwealth "must show 'with reasonable certainty that the item [has] not been altered, substituted, or contaminated prior to analysis, in any way that would affect the results of the analysis.'" *Jeter v. Commonwealth*, 44 Va. App. 733, 737 (2005) (alteration in original) (quoting *Crews v. Commonwealth*, 18 Va. App. 115, 119 (1994)). It is not, however, "required to exclude every conceivable possibility of substitution, alteration or tampering." *Alvarez v. Commonwealth*, 24 Va. App. 768, 776 (1997) (quoting *Robertson v. Commonwealth*, 12 Va. App. 854, 857 (1991)). Rather, the Commonwealth must "account for every 'vital link in the chain of possession.'" *Id.* at 777 (quoting *Robinson v. Commonwealth*, 212 Va. 136, 138 (1971)).

To be clear, accounting for every vital link does not require that "everyone who laid hands on the evidence must be called." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 311 n.1 (2009). "[I]t is not the case[] that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case." *Id.* Even when there is a gap in the chain of custody, such gaps "normally go to the weight of the evidence rather than its admissibility." *Pope*, 60 Va. App. at 511 (quoting *Aguilar v. Commonwealth*, 280 Va. 322, 332-33 (2010)).

Here, the record supports that the Commonwealth demonstrated reasonable certainty that the evidence submitted to the lab was not altered, contaminated, nor substituted prior to its analysis. Detective Roeseler testified that he collected the firearms of Corporals Clark and Giles and of Muhammad. He also collected the casings from an office floor. Detective Roeseler sealed the

- 9 -

items in an evidence box and initialed the tape identifying himself as the collecting officer. He gave each item of evidence a unique number and barcode, and he stored them in a property and evidence storage locker. He then prepared an RFLE seeking analysis on 15 shell casings and 2 firearms.

Similarly, Detective Henretty went to George Washington University Hospital and collected the bullet removed from Washington's thigh during surgery. He retrieved the bullet *directly* from Dr. Abell. Detective Henretty gave the bullet a unique number and bar code and transported the bullet to a property and evidence storage locker at the police station. He prepared an RFLE seeking analysis on the bullet recovered from Washington's thigh.

Following submission for analysis, only authorized officers working in the crime scene unit have access to items stored in property and evidence storage. Both detectives' RFLEs indicated that Officer Ahn, who at the time worked for the crime scene unit as an authorized officer, retrieved the items and took them to the lab for analysis. Officer Ahn signed his name in a box designating himself as the submitting officer. McMaster identified the items listed on the RFLEs as the same pieces of evidence she tested. Both RFLEs indicate that Officer Meyer returned all items from the lab to property and evidence. The Commonwealth's evidence accounted for each essential link, establishing a proper chain of custody.

Although Officer Ahn did not testify at trial, the RFLEs establish that he retrieved the evidence, transported it to the lab, and that he was authorized to do so. It is well-settled that "[a] court need not hear . . . from every witness who physically handled the samples for the certificate to be admissible." *Anderson v. Commonwealth*, 48 Va. App. 704, 717 (2006), *aff'd*, 274 Va. 469 (2007). Rather, the Commonwealth needed only to establish, with "reasonable certainty," that the evidence had not been compromised in a way that would affect McMaster's analysis. *Jeter*, 44 Va. App. at 737 (quoting *Crews*, 18 Va. App. at 119). *See Anderson*, 48 Va. App. at 717.

Here, there is nothing to indicate that the physical evidence was tampered with in any way. The record does not reflect an unaccounted period, a broken seal, nor any indication of substitution. Because there is no evidence of tampering or alteration, the trial judge properly left to the jury the decision of what—if any—weight to give to Officer Ahn's absence at trial. The trial court did not abuse its discretion in overruling Muhammad's objection as to the chain of custody, and thus did not err in allowing McMaster's testimony and in admitting the certificates of analysis into evidence.

## II. Motion to Suppress

Muhammad assigns error to the trial court's denial of his motion to suppress his statements to the police.[6] He argues that his recent surgeries and the ensuing pain rendered his statements to Arlington detectives involuntary. We find that Muhammad's argument has no merit.

"On appeal from a denial of a suppression motion, we must review the evidence in the light most favorable to the Commonwealth, giving it the benefit of any reasonable inferences." *Hill v. Commonwealth*, 52 Va. App. 313, 318 (2008) (quoting *Slayton v. Commonwealth*, 41 Va. App. 101, 103 (2003)). It is an appellant's burden to demonstrate that the trial court committed reversible error. *Aponte v. Commonwealth*, 68 Va. App. 146, 156 (2017). "Whether a statement is voluntary is ultimately a legal rather than a factual question, but subsidiary factual decisions are entitled to a presumption of correctness." *Commonwealth v. Peterson*, 15 Va. App. 486, 487 (1992) (citation omitted). We review de novo the voluntariness of a statement. *Midkiff v. Commonwealth*, 250 Va. 262, 268-69 (1995).

---

[6] During his interview with the police, Muhammad described his relationship with Washington, the events leading up to his appearance at National Waste, and his experience while at National Waste, and he admitted to discharging his firearm twice.

The Fifth Amendment's prohibition against compulsory self-incrimination requires that an individual's statements be voluntary. *See Aldridge v. Commonwealth*, 44 Va. App. 618, 639 (2004) ("In criminal trials, . . . wherever a question arises whether a confession is incompetent because not voluntary, the issue is controlled by . . . the Fifth Amendment." (quoting *Missouri v. Seibert*, 542 U.S. 600, 607 (2004))). The burden of proving voluntariness belongs to the Commonwealth, who must satisfy her burden by a preponderance of the evidence. *Washington v. Commonwealth*, 43 Va. App. 291, 302 (2004). In a voluntariness analysis the "question in each case is whether the defendant's will was overborne at the time he confessed," *Hill*, 52 Va. App. at 318 (quoting *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963)), or "whether 'the statement is the "product of an essentially free and unconstrained choice by its maker,"'" *Roberts v. Commonwealth*, 18 Va. App. 554, 557 (1994) (quoting *Stockton v. Commonwealth*, 227 Va. 124, 140 (1984)).

In assessing whether an accused's will was overborne at the time of his statement, a court must look to the totality of the circumstances. *Peterson*, 15 Va. App. at 488. This includes consideration of "age, intelligence, mental and physical condition, background and experience with the criminal justice system, the conduct of the police, and the circumstances of the interview." *Bottenfield v. Commonwealth*, 25 Va. App. 316, 323 (1997).

An individual's degree of pain may impact the voluntariness of a statement. Although "[t]he amount of coercion necessary to trigger the due process clause may be lower if the defendant's ability to withstand the coercion is reduced by intoxication, drugs, or pain, . . . *some* level of coercive police activity must occur before a statement or confession can be said to be involuntary." *Peterson*, 15 Va. App. at 488. We have said,

> "[A] deficient mental condition (whether the result of a pre-existing mental illness or, for example, pain killing narcotics administered after emergency treatment) is not, without more, enough to render a waiver [or confession] involuntary . . . . The evidence [must] show

- 12 -

that law enforcement officials exploited [the accused's] weakened condition with coercive tactics," although the degree of coercion required is lower where the suspect's level of susceptibility is higher.

*Rodriguez v. Commonwealth*, 40 Va. App. 144, 163 (2003) (all but first alteration in original) (quoting *U.S. v. Cristobal*, 293 F.3d 134, 141 (4th Cir. 2002)). Thus, as a predicate to finding that a defendant's statement is involuntary, there must be some evidence that the police *coerced* the statement. *Id.*

Based on the totality of the circumstances presented here, we cannot say that Detective Henretty and Detective Ortiz coerced Muhammad so as to render his will overborne. Indeed, the record does not indicate that the detectives acted at all coercively. They began the interview by reading Muhammad his rights. Following that advisement, the detectives then asked Muhammad about his medication to ensure that Muhammad was not under an influence "that would maybe cloud his judgment." A few times throughout the interview, Muhammad stated that he was in pain—once at the beginning of the interview, a few times during a monologue, and once at the end of his interview. Notably, Muhammad himself ultimately ended the interview.[7]

During the interview, the detectives gave Muhammad food and water and sat him in a padded chair in a climate-controlled room. *See Keepers v. Commonwealth*, 72 Va. App. 17, 42 (2020) (this Court holding that although an interview was "lengthy," the defendant's statements were voluntary, and detectives provided the defendant with food and water). Muhammad appeared comfortable, calm, and talkative. Although handcuffed to a desk by his uninjured arm, Muhammad used his injured arm to make physical gestures while speaking; he also stood to show how certain events occurred. *See Beavers v. Commonwealth*, 245 Va. 268, 275 (1993) (a

---

[7] According to a transcript of Muhammad's interview with Detective Henretty and Detective Ortiz, Muhammad asked, "Is we done," to which Detective Henretty responded, "I think so, man. Give us a few minutes, we're going to get you down to the jail, okay." To that, Muhammad responded with his final statement of pain: "I'm in a high tense of pain right now."

- 13 -

defendant's confession was voluntary because the defendant "was responsive and seemed to understand what was going on"); *see also Novak v. Commonwealth*, 20 Va. App. 373, 387 (1995) (a defendant's confession was voluntary where the defendant was "articulate in his answers" and understood "the interview process and what was being said and why he was there"). Muhammad did not indicate an inability to continue due to his pain.[8] Muhammad terminated the 2.5-hour interview, and the detectives responded accordingly. Additionally, our review of both the interview transcript and the digital recording exhibit show that neither detective threatened, yelled at, or made promises to Muhammad, nor did either detective utilize trickery or deceit to obtain Muhammad's statements.

We recognize that the detectives imposed a certain level of restraint on Muhammad by chaining him to the desk during the interview. However, this Court and others have held that despite a physical restraint, statements can nonetheless be voluntary. *See Medley v. Commonwealth*, 44 Va. App. 19, 26-37 (2004) (en banc) (denying the defendant's motion to suppress when he knowingly and intelligently waived his rights while handcuffed and in the back of a police patrol vehicle); *see also Everetts v. United States*, 627 A.2d 981 (D.C. 1993) (holding that the confession of a youth obtained after being handcuffed to a desk for eight hours was voluntary where the videotape confession showed no psychological coercion). The appropriate inquiry is always whether, under a totality of the circumstances, an accused professed the statements of his own will and choice. We hold that the detectives did not coerce Muhammad and that his statements made during the interview were voluntary.

---

[8] Indeed, at one point, Muhammad offered to take a polygraph test: "At this time I'm in a lot of pain, but I'm willing to take [a polygraph] test, because I'm willing to go that far."

### III. Sufficiency of the Evidence

Muhammad assigns error to the trial court for denying his motion to strike the charges of aggravated malicious wounding and abduction of Germain. He argues that the evidence was insufficient to support either conviction. We disagree, holding that the evidence was sufficient on both convictions.

When reviewing the sufficiency of the evidence, the "judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it." *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). In reviewing the sufficiency of the evidence, "[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." *Secret v. Commonwealth*, 296 Va. 204, 228 (2018) (alteration in original) (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)). "[T]he relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)).

#### A. *Aggravated Malicious Wounding*

Muhammad contends that the evidence failed to prove Washington was permanently and significantly impaired because of her injury. Muhammad essentially argues that, given Dr. Abell's testimony that Washington "would recover to some degree if she participated in therapy" and Washington's "minimal" scarring "not visible under normal circumstances," her injuries are insufficiently severe.

Code § 18.2-51.2 outlines the elements required to sustain a conviction for aggravated malicious wounding:

> If any person maliciously shoots, stabs, cuts or wounds any other person, or by any means causes bodily injury, with the intent to

- 15 -

> maim, disfigure, disable or kill, he shall be guilty of a Class 2 felony *if the victim is thereby severely injured and is caused to suffer permanent and significant physical impairment.*

Code § 18.2-51.2(A) (emphasis added). "Physical impairment" is defined as "any physical condition, anatomic loss, or cosmetic disfigurement." *Alston v. Commonwealth*, 77 Va. App. 639, 650 (2023) (quoting *Lamm v. Commonwealth*, 55 Va. App. 637, 644 (2010)). "'[P]ermanent' has been defined as 'continuing or enduring (as in the same state, status, place) without fundamental or marked change.'" *Ellis v. Commonwealth*, 70 Va. App. 385, 392 (2019) (quoting *Webster's Third New International Dictionary* 1683 (3d ed. 1993)). "To prove an injury is permanent, the Commonwealth need not present definitive testimony that a victim's injuries will never improve, but instead can leave it to the common sense of the [factfinder] to determine if the injuries are permanent." *Alston*, 77 Va. App. at 650 (alteration in original) (quoting *Lamm*, 55 Va. App. at 644-45).

This Court has recognized scars as a permanent and significant injury for purposes of an aggravated malicious wounding conviction. *See Hawkins v. Commonwealth*, 64 Va. App. 650, 654 (2015) (recognizing a victim's large abdominal scar as a permanent and significant injury); *see also Newton v. Commonwealth*, 21 Va. App. 86, 90 (1995) (recognizing that a victim's facial scarring, though obscured by his beard, constituted a permanent and significant physical impairment). Here, Washington was shot twice. Dr. Abell removed the bullets from Washington's body because they were causing her "intractable pain" and high blood pressure due to their lead content. Washington has a "large scar" near her right hip covering "about an inch and a half by a little less than an inch wide" of her thigh. Washington also has scarring on her right breast. At trial, Dr. Abell testified that anytime tissue is removed to the degree it was in Washington's surgeries, "you will never have the same amount of mobility or flexibility in that area, and there will always be a scar on the skin."

- 16 -

Muhammad argues that Washington's scarring is distinguishable from other cases in which the wounds were either longer or deeper. *See Commonwealth v. Donkor*, 256 Va. 443, 445 (1998) (the victim receiving a cut "four to six inches long" and requiring "70 to 80 sutures to close"); *Newton*, 21 Va. App. at 90 (the victim required 10 to 20 stitches and had "obvious and visible" facial scars and a visible scar on his ear).

We decline to participate in a line-drawing exercise, thereby holding when a scar is deep *enough* or long *enough* to be considered a "permanent and significant physical impairment" under Code § 18.2-51.2. Rather, the standard of review governs and disposes of Muhammad's arguments. The judgment of the trial court is presumed correct—it is not disturbed on appeal unless it is plainly wrong or without evidence to support it. *McGowan*, 72 Va. App. at 521. Here, the jury heard Dr. Abell testify that the amount of tissue removed from Washington's hip was significant. It also heard that when that amount of tissue is removed, there are typically long-term consequences—including mobility issues and permanent scarring. A reasonable factfinder could find the nature of Washington's injuries sufficiently severe as to be permanent and significant impairments necessary to convict Muhammad of aggravated malicious wounding. Given that such finding was neither plainly wrong nor unsupported, Muhammad's arguments are unavailing. The trial court did not err in denying Muhammad's motion to strike the aggravated malicious wounding charge.

B. *Abduction*

Muhammad argues that the evidence fails to establish that he intended to abduct Germain because his "actions were not directed to [Germain]." Muhammad also argues that he did not physically detain Germain. We find these arguments unpersuasive.

### 1.  Intent

"Any person who, by force, intimidation or deception, and without legal justification or excuse, seizes, takes, transports, detains or secretes another person with the intent to deprive such other person of h[er] personal liberty . . . , shall be deemed guilty of abduction."  Code § 18.2-47(A).  "[T]he *actus reus* of the crime is a taking, transporting, or detention of another, while the *mens rea* of the crime is a specific intent to deprive another of her liberty."  *Brown v. Commonwealth*, 74 Va. App. 721, 730-31 (2022).

"Intent is the purpose formed in a person's mind and may, like any other fact, be shown by circumstances, including the 'words or conduct' of the alleged offender."  *Secret*, 296 Va. at 228-29 (quoting *Commonwealth v. Herring*, 288 Va. 59, 75 (2014)).  Indeed, intent "most often is[] proven by circumstantial evidence and the reasonable inferences to be drawn from proven facts."  *Id.* at 229 (quoting *Viney v. Commonwealth*, 269 Va. 296, 301 (2005)).  Determination of an accused's intent "presents a factual question which lies peculiarly within the province of the jury."  *Ingram v. Commonwealth*, 192 Va. 794, 802 (1951).

In evaluating Muhammad's words and conduct, and considering the reasonable inferences drawn from these facts, a jury could properly find that Muhammad intended to abduct Germain. The record reflects that Germain ran to Washington's office and confronted Muhammad and that, in response, Muhammad pointed his gun at Germain and told her to leave.  Later, while Germain was in her office and on the phone with 911, Muhammad entered her office, took the phone, and ordered her to sit down while brandishing a firearm.  Muhammad also yelled and cursed.  Washington testified that Germain sat with her hands raised.  Germain explained that she remained in the office because Muhammad had a gun and he was "very angry."  A factfinder could reasonably infer from these facts that Muhammad intended to induce Germain to obey his commands by causing her to fear that Muhammad would shoot the gun he pointed at her.

## 2. Detention

A defendant detains a victim by "keeping the victim in a specific place 'through the use of force, intimidation, or deception.'" *Brown*, 74 Va. App. at 731 (quoting *Herring*, 288 Va. at 74). Proof of asportation is not required. Under Code § 18.2-47, "mere detention is sufficient" to establish abduction. *Jerman v. Dir., Dep't of Corr.*, 267 Va. 432, 439 (2004).

In *Walker v. Commonwealth*, 74 Va. App. 475 (2022), *aff'd*, 302 Va. 304 (2023), a trial court convicted the appellant of abduction. The appellant walked into a bank and pointed a gun "everywhere" and at "everybody." *Id.* at 492. The appellant caused one victim, Galvez, to "go to the ground and remain there." *Id.* at 491. On appeal, the appellant argued that he did not verbally order Galvez to the ground or to remain in place. *Id.* Rather, Galvez "made a voluntary decision" to remain on the floor. *Id.* Therefore, according to the appellant, he did not detain Galvez. This Court affirmed the appellant's convictions, holding that the *control* the appellant asserted over Galvez was sufficient to support his abduction conviction. *Id.* at 492-94. This Court noted that in enacting Code § 18.2-47, the General Assembly "focused on *control over* the victim as opposed to mere *movement of* the victim." *Id.* at 490.

The arguments Muhammad asserts here are comparable to those made unsuccessfully by the appellant in *Walker*. Muhammad argues that he did not order Germain to sit in a particular chair and there is "no indication that she could not have gotten up at any point to leave." Accordingly, Germain "had no reason to feel pressured to stay." Just as in *Walker*, the issue here concerns the level of control Muhammad exercised over Germain. Germain testified that Muhammad brandished his firearm, yelled, cursed, and ordered her to sit. In response, Germain sat down with her hands raised in submission. Accordingly, by his actions, Muhammad exercised control over Germain sufficient to support a factfinder's conclusion that Muhammad caused Germain to sit and to stay in the chair and that she was not free to move.

- 19 -

The facts, viewed in totality, sufficiently proved that Muhammad intended to, and did, by force or intimidation, and without legal justification or excuse, detain Germain with the intent to deprive her of her personal liberty.

The trial court did not err in denying Muhammad's motion to strike the abduction charge.

## IV. Jury Instruction D

Muhammad also assigns error to the trial court's refusal of his proffered Jury Instruction D, instructing the jury on the use of deadly force by the police.[9] He contends that Washington ran at him, "raising the possibility that his conduct was not malicious, but defensive or reactive." Muhammad argues that Officer Clark's inability to remember whether he warned Muhammad prior to using deadly forced caused Muhammad to react impulsively. Thus, he argues that the jury should have been instructed to determine whether his firing into the floor was in response to the police officer's improper use of deadly force.[10] Finally, Muhammad argues that this error was not harmless.

The trial court has broad discretion to grant or refuse jury instructions. *Cooper v. Commonwealth*, 277 Va. 377, 381 (2009). The role of an appellate court in reviewing a trial court ruling on a jury instruction is limited to ensuring that the law has been clearly stated and that the instructions cover all issues fairly raised by the evidence. *Id.* Thus, we review the trial court's broad discretion for abuse. *Williams v. Commonwealth*, 64 Va. App. 240, 246 (2015). "No

___

[9] Muhammad appears to argue that the trial court also erred in refusing his proffered instructions A, B, and C; however, because his assignment of error only references his proffered Jury Instruction D, we limit our analysis to that instruction. *See* Rule 5A:20(c)(1) ("Only assignments of error listed in the brief will be noticed by this Court.").

[10] At oral argument, the Commonwealth raised for the first time that Muhammad's Jury Instruction D relies on Code § 19.2-83.5, a statute that was not in effect at the time Muhammad committed the crimes. The statute was enacted in 2021, *after* Muhammad's entrance to National Waste but *prior* to his trial. Because we hold that the trial court did not err in denying this instruction, we do not address the statute's applicability to Muhammad considering its date of enactment.

instruction should be given unless it is supported by evidence, and such evidence must be more than a scintilla." *LeVasseur v. Commonwealth*, 225 Va. 564, 590 (1983). Whether credible evidence amounts to "'more than a mere scintilla . . . is a matter to be resolved on a case-by-case basis' by assessing the evidence in support of a proposition against the 'other credible evidence that negates' it." *Woolridge v. Commonwealth*, 29 Va. App. 339, 348 (1999) (alteration in original) (quoting *Brandau v. Commonwealth*, 16 Va. App. 408, 411-12 (1993)). As we have often recognized, "it is not error to refuse an instruction when there is no evidence to support it." *Commonwealth v. Sands*, 262 Va. 724, 729 (2001).

"When reviewing a trial court's refusal to give a proffered jury instruction, we view the evidence in the light most favorable to the proponent of the instruction." *Commonwealth v. Vaughn*, 263 Va. 31, 33 (2002). However, this view does not require that we ignore nonconflicting evidence merely because it is unhelpful to the proponent's position. Thus, we find that even in the most favorable light, the evidence shows that Muhammad's conduct was aggressive, violent, and deliberate and not, as he contends, impulsive or merely reactive to Washington's, or police officers', actions.

Prior to arriving at National Waste, Muhammad called Washington's daughter and told her that "he was go[ing to] mess [Washington's] life up." Muhammad also sent a barrage of angry texts to Washington. Once Muhammad arrived at National Waste, Washington ran towards him. She did not display, or even possess, a weapon. As Washington approached him, Muhammad was already reaching into his backpack. Muhammad hit her in the face with his gun two or three times as soon as she was close enough for him to do so. Washington sustained a broken nose and two black eyes from this attack. There was no evidence that Washington initiated any aggression or violence toward Muhammad or that she had threatened to do so.

- 21 -

The evidence shows that Corporal Clark observed Muhammad through Germain's office, yelling and "waiv[ing] the gun about." When Corporal Clark approached the window, Muhammad raised his gun toward Clark and exclaimed, "She did this to me!" Corporal Clark then fired through the glass, striking Muhammad. When Clark took cover in the adjacent office, he observed shots coming through the office wall. Further, Corporal Giles testified that he heard Corporal Clark yell, "drop the gun, drop the gun," before Corporal Clark fired his weapon. Contrary to Muhammad's contention, all the evidence indicates that his actions were *intentional* and *deliberate*—far different from the defensive and reactive response he asserts. Moreover, there appears to be no evidence Muhammad discharged his gun accidently. Muhammad failed to establish more than a scintilla of evidence supporting his proposed jury instruction. The trial court did not abuse its discretion in refusing Jury Instruction D. We hold that the trial court did not err in its refusal.[11]

## V. Admission of the 911 Call

Finally, Muhammad assigns error to the trial court's admission of the 911 emergency call recording into evidence. We review trial court rulings regarding admissibility of evidence for abuse of discretion. *Lawrence v. Commonwealth*, 279 Va. 490 (2010). Muhammad contends that the 911 emergency call recording (1) "has little probative value that was not covered by other testimony and was therefore needlessly cumulative"[12]; and (2) "contained a hearsay statement going to the ultimate fact that should have been excluded." For the following reasons, we disagree.

---

[11] Because we hold that the trial court did not err, we need not engage in a harmless error analysis. *See Sands*, 262 Va. at 729 ("[I]t is not error to refuse an instruction when there is no evidence to support it.").

[12] Muhammad's contention that the 911 call is needlessly cumulative was not raised at trial, and thus was not properly preserved for our review. *See* Rule 5A:18 (an objection must have been stated "with reasonable certainty at the time of the ruling").

A. *Probative Value v. Unfair Prejudice*

Muhammad asserts that the 911 call is unfairly prejudicial because it contains the audible reactions of individuals at National Waste "who are reacting in terror." According to Muhammad, the terror expressed on the recording makes it more prejudicial than probative.

Although relevant evidence is generally admissible, Va. R. Evid. 2:402, even relevant evidence may be excluded if (1) "the probative value . . . is *substantially outweighed* by . . . the danger of unfair prejudice" or (2) "the evidence is needlessly cumulative," Va. R. Evid. 2:403(a)(i), (b) (emphasis added).

Courts apply a balancing test in determining whether the relevant evidence is substantially outweighed by the danger of unfair prejudice. *Lee v. Spoden*, 290 Va. 235, 252 (2015). Evidence that is "highly prejudicial to a party's claim or defense, in and of itself, 'is not a proper consideration' in applying the balancing test." *Fields v. Commonwealth*, 73 Va. App. 652, 672 (2021) (quoting *Lee*, 290 Va. at 252). The fact that evidence is "powerful because it accurately depicts the gravity and atrociousness of the crime or the callous nature of the defendant does not thereby render it inadmissible." *Id.* at 672-73 (quoting *Powell v. Commonwealth*, 267 Va. 107, 141 (2004)). Rather, to constitute unfair prejudice, the evidence must inflame a factfinder's passions and "invite decision based upon a factor unrelated to the elements of the claims and defenses in the pending case." *Id.* at 673 (quoting *Lee*, 290 Va. at 251). It must "generate[] such a strong *emotional* response that it is unlikely that the jury could make a *rational* evaluation of its proper evidentiary weight." *Id.*

Here, two of Washington's co-workers both called 911.[13] One co-worker reported that a man broke into the office and was attacking a woman "right now." Similarly, a second co-worker

---

[13] Although Washington's co-workers called separately, the calls were combined into one call at trial. Thus, we refer to the "911 call" in the singular.

reported that he heard "a deep voice yelling at [Washington]" and then what sounded like "a few pops." The co-workers' respective calls to 911 captured the screams and the gunshots heard in the background as they occurred.

There is nothing to suggest that the 911 recording caused an emotional response so as to render a factfinder's rational thinking compromised. Although the 911 recording captures the seriousness of Muhammad's actions, it does not inflame the passions of the jury. Rather, the recording corroborates testimony at trial that Muhammad entered the office and attacked Washington. Thus, we do not find that the trial court erred in finding that the probative value of the 911 call recording outweighed its possible prejudicial effect.

B. *Hearsay*

Muhammad contends that the trial court erred by admitting the 911 call recording under a hearsay exception. He argues that no such exception applies.[14]

"As a general rule, hearsay evidence is incompetent and inadmissible, and '[t]he party seeking to rely upon an exception to the hearsay rule has the burden of establishing admissibility.'" *Esser v. Commonwealth*, 38 Va. App. 520, 525 (2002) (alteration in original) (quoting *Neal v. Commonwealth*, 15 Va. App. 416, 421 (1992)). An excited utterance is "[a] spontaneous or impulsive statement prompted by a startling event or condition and made by a declarant with firsthand knowledge at a time and under circumstances negating deliberation." Va. R. Evid. 2:803(2). Excited utterances are admissible if relevant. *Caison v. Commonwealth*, 52 Va. App. 423, 431 (2008). However, "[t]here is no fixed rule by which the question whether the statement is

---

[14] Although Muhammad's brief argues against the present sense impression exception to hearsay, the trial court found that the 911 call was admissible under the excited utterance exception. As such, we address Muhammad's arguments considering the trial court's finding— the excited utterance exception. Regardless, our analysis would likely be similar under either theory. *See Arnold v. Commonwealth*, 4 Va. App. 275, 282 (1987) (considering the same analysis to hold that the evidence "did not constitute an excited utterance or a present sense impression").

admissible as an excited utterance can be decided." *Id.* (quoting *Clark v. Commonwealth*, 235 Va. 287, 292 (1988)).  The issue "depends [upon] the circumstances of each case." *Id.* (alteration in original) (quoting *Clark*, 235 Va. at 292).  On appeal, we review whether the trial court abused its discretion in admitting evidence under the excited utterance exception to the hearsay rule.  *See id.*

Here, both co-workers were present at National Waste.  The statements they made were prompted by a startling event—Muhammad's attack of Washington, his yelling, and his brandishing the firearm.  The record reflects that the statements were made simultaneously with the startling event and were not the result of deliberation.  Thus, we hold that the trial court did not err in admitting the 911 call recording under the excited utterance exception to the hearsay rule.

CONCLUSION

For the reasons above, we affirm the judgment of the trial court.

*Affirmed*.