Present: All the Justices

COMMONWEALTH OF VIRGINIA

v.  Record No. 010071  OPINION BY JUSTICE CYNTHIA D. KINSER
                                November 2, 2001
VICTORIA SHELTON SANDS

FROM THE COURT OF APPEALS OF VIRGINIA

A jury convicted the defendant, Victoria Shelton Sands, of the first degree murder of her husband, Thomas Lee Sands, and of the use of a firearm in the commission of murder.  The Court of Appeals of Virginia, finding that the trial court erred in refusing to give the defendant's requested jury instruction on self-defense, reversed the convictions and remanded the case for a new trial.  Sands v. Commonwealth, 33 Va. App. 669, 682, 536 S.E.2d 461, 467 (2000).  This appeal by the Commonwealth followed.

Although the defendant had suffered considerable physical abuse at the hands of her husband before fatally shooting him, we find no evidence of an overt act indicative of the deceased's imminent intention to kill or seriously harm his wife at the time of the shooting, such as to make a self-defense instruction appropriate.  Thus, we will reverse the judgment of the Court of Appeals and reinstate the defendant's convictions.

FACTS

Thomas Lee Sands began beating his wife approximately two years after they were married in 1983. Over time, the abuse grew more severe, finally becoming a daily occurrence. The defendant repeatedly asked her husband for a divorce or suggested that they go their "different ways," but he always refused her attempts to end their relationship and responded by beating her again. The defendant believed that she could not leave because Thomas threatened to kill her and her family if she did so. After one such episode in July 1998, Thomas kept his wife hostage in their residence for three weeks.

In August 1998, the defendant sought the assistance of her parents in an attempt to have her husband arrested for his illegal activities.[1] In the defendant's words, "If I could get Tommy busted on all this stuff, . . . I could get him out of my life." However, shortly after the defendant's mother spoke with a law enforcement officer about her daughter's situation, the defendant's parents were critically injured in an automobile accident, resulting in their hospitalization. The defendant was

---

[1] During the last eight to ten years of the marriage, Thomas was not lawfully employed; he instead sold cocaine, marijuana, and "bootleg" whiskey. He also regularly carried a gun.

afraid to take any other action herself because she believed her husband would kill her if he discovered her plans.

On the evening of August 22, 1998, the defendant returned home after visiting her injured parents in the hospital. At that time, according to the defendant, Thomas "went into a rage," beat her, and threatened to kill her. Around 11:00 a.m. the next morning, a neighbor observed the defendant walk out of her kitchen door onto the back porch with a gun in her hand. The gun was raised in a "semi-fire" position. The defendant claims she was trying to get the gun out of the house to hide it for her own protection.

The defendant's husband, however, followed her onto the back porch where the couple again fought. During that scuffle, Thomas pushed his wife into a sink, opened a door, and threw her down several concrete steps onto the ground. At some point during that incident, he seized the gun that the defendant had been carrying, and while she was lying on the ground with Thomas sitting on top of her, he fired two shots into the ground near her. The couple then went back inside the house, where Thomas demonstrated how to cock the gun, placed it on a counter between them, and taunted the defendant to "pick the gun up and shoot [him]." The fight

3

ended temporarily when the couple's four-year-old son entered the room.

Soon thereafter, the defendant's aunt, Sallie Hodges, arrived at the house. Hodges described her niece as "real sad," with a bruise on the side of her face. Although the defendant had planned to return to the hospital to care for her parents, Thomas would not allow her to leave with Hodges. He kept pacing the floor and pointing his finger at Hodges, while stating, "I'll kill you and your whole family. . . . I've knocked off a few and I can knock off a few more." He likewise would not allow his wife to leave with her brother who had also stopped at the house.

For the rest of the day, Thomas drank beer, used cocaine, physically abused his wife, and threatened to kill her. He would intermittently watch television in the bedroom for short periods of time, but always returned to the assault upon his wife. The defendant admitted that she also used some cocaine that day.

Around 10:00 p.m., the defendant telephoned Hodges and asked her to come over and get the couple's son. While the defendant was on the telephone with Hodges, a neighbor stopped by the house and agreed to take the child to Hodges' home. The defendant testified that she wanted her

4

son out of the house because she "sensed" that her husband was going to kill her.

The defendant then telephoned her sister-in-law, Angela Shelton, and asked her to come to the house. After that telephone call, Thomas beat his wife again. During that episode, which the defendant described as "the longest," Thomas used his fists and the butt of a gun to attack her. He also pushed the barrel of the gun up into his wife's nose.

When Shelton arrived, the defendant came to the door to let her into the house. Shelton observed that the defendant was crying and looked upset. The defendant asked her sister-in-law to accompany her into the bathroom, where Shelton helped the defendant pull up her shirt. Upon seeing her injuries, the defendant "started shaking really, really bad, and her eyes got real wild eyed[,]" according to Shelton. Referring to her husband, the defendant then stated, "He's the devil. I got to get this devil out of my house. He's evil. He [is] gonna kill me." The defendant then ran "out of the bathroom and the door of the living room, . . . came back to the kitchen, . . . opened the cabinet door, . . . got the gun, and . . . went to the bedroom" where she shot her husband five times while he was lying in bed, watching television. When asked at trial if

5

she said anything to her husband before shooting him, the defendant answered, "No sir." She also testified that her husband said only, "What are you doing[?]" After shooting her husband, the defendant walked back to the kitchen, put the gun on a bar, and telephoned "911." The first law enforcement officer to arrive at the scene received a call about the incident at approximately 11:00 p.m.

Several hours after the shooting, an emergency room physician examined the defendant. That doctor observed "multiple bruises and contusions throughout [the defendant's] body," especially in the areas of her upper arms and flanks. However, x-rays of her skull, spine, and chest were normal. A police officer who investigated the shooting and saw the defendant at the scene reported that he observed bruising on the defendant's arms and that her nose "was kind of twisted to the side."

At trial, the defense proffered the following jury instruction on self-defense:

> **THE COURT INSTRUCTS THE JURY** that if you believe that the defendant was without fault in provoking or bringing on the difficulty, and if you further believe that the defendant reasonable [sic] feared, under the circumstances as they appeared to her, that she was in danger of being killed or that she was in danger of great bodily harm, then the killing was in self-defense, and you shall find the defendant not guilty.

6

The circuit court denied the instruction on the basis that there was "insufficient evidence for a self-defense instruction."

ANALYSIS

The question to be decided in this appeal is whether the defendant was entitled to a jury instruction on self-defense. Because the trial court refused to grant the instruction proffered by the accused, we view the facts in the light most favorable to the defendant. Commonwealth v. Alexander, 260 Va. 238, 240, 531 S.E.2d 567, 568 (2000). However, an instruction is proper only if supported by more than a scintilla of evidence. Commonwealth v. Donkor, 256 Va. 443, 445, 507 S.E.2d 75, 76 (1998). If the instruction is not applicable to the facts and circumstances of the case, it should not be given. Hatcher v. Commonwealth, 218 Va. 811, 813-14, 241 S.E.2d 756, 758 (1978) (citing Banner v. Commonwealth, 204 Va. 640, 647, 133 S.E.2d 305, 310 (1963)). Thus, it is not error to refuse an instruction when there is no evidence to support it. See LeVasseur v. Commonwealth, 225 Va. 564, 590-92, 304 S.E.2d 644, 658-59 (1983), cert. denied, 464 U.S. 1063 (1984).

The principles governing a plea of self-defense are well-established. Self-defense is an affirmative defense to a charge of murder, and in making such a plea, a

"defendant implicitly admits the killing was intentional and assumes the burden of introducing evidence of justification or excuse that raises a reasonable doubt in the minds of the jurors."  McGhee v. Commonwealth, 219 Va. 560, 562, 248 S.E.2d 808, 810 (1978).  The "bare fear" of serious bodily injury, or even death, however well-grounded, will not justify the taking of human life.  Stoneman v. Commonwealth, 66 Va. (25 Gratt.) 887, 900 (1874).  "There must [also] be some overt act indicative of imminent danger at the time."  Vlastaris v. Commonwealth, 164 Va. 647, 652, 178 S.E. 775, 776 (1935).  See also Yarborough v. Commonwealth, 217 Va. 971, 975, 234 S.E.2d 286, 290 (1977); Mercer v. Commonwealth, 150 Va. 588, 597, 142 S.E. 369, 371 (1928).  In other words, a defendant "must wait till some overt act is done[,] . . . till the danger becomes imminent."  Vlastaris, 164 Va. at 652, 178 S.E. at 777.  In the context of a self-defense plea, "imminent danger" is defined as "[a]n immediate, real threat to one's safety . . . ."  Black's Law Dictionary 399 (7th ed. 1999).  "There must be . . . some act menacing present peril . . . [and] [t]he act . . . must be of such a character as to afford a reasonable ground for believing there is a design . . . to do some serious bodily harm, and imminent danger of carrying such design into immediate

8

execution." Byrd v. Commonwealth, 89 Va. 536, 539, 16 S.E. 727, 729 (1893).

In holding that the trial court erroneously refused to instruct the jury on self-defense, the Court of Appeals construed the term "imminent" to mean something less than "immediate." Sands, 33 Va. App. at 678, 536 S.E.2d at 465 (quoting Sam v. Commonwealth, 13 Va. App. 312, 325, 411 S.E.2d 832, 839 (1991)). Applying its view of that term, the Court of Appeals concluded that, "[u]nder the facts of this case, the fact finder could reasonably have concluded that [the defendant] was without fault in beginning the altercation, reasonably apprehended she was in imminent danger of death or serious bodily harm and, thus, was justified in shooting her husband to prevent him from killing her or further inflicting serious bodily harm upon her." Sands, 33 Va. App. at 679, 536 S.E.2d at 465.

We agree that the defendant reasonably believed that she was in danger of serious bodily harm or death. Nevertheless, that reasonable belief is not dispositive of the issue before us in this appeal. The question here is whether the circumstances immediately surrounding the killing, specifically, the actions of the defendant's husband at that time, were sufficient to create a reasonable belief of an imminent danger which had to be

9

met.  The Court of Appeals did not squarely address this requirement of an overt act.

Even when viewed in the light most favorable to the defendant, the evidence fails to reveal any overt act by her husband that presented an imminent danger at the time of the shooting.  The last episode between the defendant and her husband occurred after the defendant telephoned Shelton.[2]  Then, sufficient time elapsed for Shelton to arrive at the couple's home, and for the defendant to view the extent of her injuries while in the bathroom with Shelton, walk from the bathroom to the living room door, turn around and proceed back into the kitchen, retrieve a gun from a cabinet, and walk back into the bedroom where her husband was reclining on the bed, watching television.  At that moment, the only reaction by the defendant's husband was his question, "What are you doing[?]"  While we do not doubt the defendant's genuine fear for her life or minimize the atrocities inflicted upon her, we cannot point to any evidence of an overt act indicating imminent danger, or indeed any act at all by her husband, when she shot him five times while he reclined on the bed.  Nor did the Court

---

[2] The defendant acknowledges on brief that the last assault occurred within an hour of the shooting.

10

of Appeals cite to any such evidence.  Thus, the defendant was not entitled to an instruction on self-defense.

The requirement of an overt act indicative of imminent danger ensures that the most extreme recourse, the killing of another human being, will be used only in situations of necessity.  "The plea of self-defense is a plea of necessity and the necessity must be shown to exist or there must be shown such reasonable apprehension of the immediate danger, by some overt act, as to amount to the creation of necessity."  Vlastaris, 164 Va. at 651, 178 S.E. at 776.

CONCLUSION

For these reasons, we will reverse the judgment of the Court of Appeals and enter final judgment reinstating the convictions.

Reversed and final judgment.

JUSTICE KOONTZ, dissenting.

I respectfully dissent.  The facts in this case as recited by the majority fully support the majority's conclusion that Victoria Shelton Sands "reasonably believed that she was in danger of serious bodily harm or death" as a result of "the atrocities inflicted upon her" by her husband on the day Sands shot and killed her husband. Nevertheless, the majority finds "no evidence of an overt act indicative of the deceased's imminent intention to kill

11

or seriously harm his wife at the time of the shooting such as to make a self-defense instruction appropriate."  In my view, the majority decides as a matter of law an issue that was properly within the sole province of the jury.

I have no quarrel with the majority's recitation of the law applicable to this case.  Clearly, "[w]hether the defendant [acted] in self-defense depends on whether [she] reasonably believed that it was necessary to [act] as [she] did in order to save [her] own life or avoid serious bodily harm."  Boone v. Commonwealth, 195 Va. 708, 712, 80 S.E.2d 412, 414 (1954).  The majority is also correct that the evidence must show some overt act by the deceased indicative of imminent danger.  Vlastaris v. Commonwealth, 164 Va. 647, 652, 178 S.E.2d 775, 777 (1935).  "These are ordinarily questions for the jury."  Boone v. Commonwealth, 195 Va. at 712, 80 S.E.2d at 414.  And, a self-defense instruction is proper if supported by more than a scintilla of evidence.  See Commonwealth v. Donkor, 256 Va. 443, 445, 507 S.E.2d 75, 76 (1998).

The majority concludes that the temporary cessation in the victim's brutalization of Sands removed her from "imminent danger" and, thus, she was not entitled to have the jury instructed on self-defense and to have the jury consider the reasonableness of her perception that her life

12

was in imminent danger when she shot the victim.  The majority reaches this conclusion by reasoning that imminent danger means "a[n] immediate, real threat to one's safety." In other words, the majority, in effect, concludes that because there was no objective simultaneous threat to Sands' life, her acknowledged subjective belief that she was in imminent danger when she shot her husband could not have been reasonable.

In my view, the pattern of brutalizing acts committed upon Sands over the preceding twenty-four hours, coupled with the repeated threats to kill her, constituted the necessary "overt act" on the part of the victim such as to make a self-defense instruction appropriate.  Although the victim was reclining in bed at the moment of the killing, a jury could have concluded that Sands' belief that she nevertheless remained in imminent danger of death or serious bodily harm was reasonable under the circumstances. As noted by the majority, the victim "would intermittently watch television in the bedroom for short periods of time, but always returned to the assault upon his wife."  There is no evidence that this pattern would not continue so as exclude a reasonable conclusion that at any moment the victim would resume beating Sands and placing her life in

danger.  Thus, there was clearly more than a scintilla of evidence to support a self-defense instruction.

Accordingly, I would hold that the trial court erred in not instructing the jury on the elements of self-defense, and for that reason, I would affirm the judgment of the Court of Appeals reversing Sands' conviction and remanding the case for a new trial.