COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Beales, Decker and AtLee
Argued at Salem, Virginia


SYLVESTER MATTHEW CHEATHAM

                                                    MEMORANDUM OPINION[*] BY
v.        Record No. 1615-14-3                      JUDGE RICHARD Y. ATLEE, JR.
                                                    FEBRUARY 16, 2016

COMMONWEALTH OF VIRGINIA


                    FROM THE CIRCUIT COURT OF AMHERST COUNTY
                                J. Michael Gamble, Judge

            Jordan B. Davies (Harris & Allen, P.C., on brief), for appellant.

            Robert H. Anderson, III, Senior Assistant Attorney General
            (Mark R. Herring, Attorney General, on brief), for appellee.


        Appellant Sylvester Matthew Cheatham appeals a conviction[1] for first-degree murder in

the Amherst County Circuit Court ("trial court"), for which he received an active sentence of life

in prison.  Appellant argues that the trial court erred in two respects:  first, in refusing to instruct

the jury on the theory of self-defense because there was more than a scintilla of evidence that

appellant acted under reasonable apprehension of death or great bodily injury; and second, by

overruling an objection to the Commonwealth's leading questions during direct examination.

For the following reasons, we affirm.

                                    I. BACKGROUND

        Each assignment of error requires this Court to view the facts from different perspectives:

in the light most favorable to the defendant with regard to the refused jury instruction, and the

_____

        [*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

        [1] The trial court also found appellant guilty of grand larceny and sentenced him to an
additional year in prison.  However, this conviction is not pertinent to this appeal.

light most favorable to the Commonwealth when reviewing the challenged leading questions. For preliminary purposes, we present the uncontroverted evidence, and then describe appellant's version of the facts. When necessary in the analysis, we describe the testimony of other witnesses, viewed through the appropriate lens.

*A. Uncontroverted Evidence*

Appellant and the victim married in 1997. In 2012, the victim began an affair with a man she dated prior to marrying appellant, and went to live with him in Norfolk. Appellant received a lump sum of approximately $100,000 in workers' compensation benefits in January 2013. In early March, appellant began to serve a five-month jail sentence for a DUI conviction. The victim withdrew approximately $43,000 of appellant's workers' compensation award and deposited it in a different account. While appellant was in jail, the victim filed for divorce. Appellant objected to the divorce.

Appellant was released in late July 2013. On July 31st, appellant rented a motel room in Appomattox. That night and into the early morning hours of August 1st, cell phone records reflect numerous calls between the appellant and the victim; one call lasted over three hours. A clerk from a convenience store in Appomattox testified that just before 4:00 a.m. on the 1st, the victim, traveling alone, purchased drinks, cigarettes, and food.

A motel employee found the victim's body the morning of August 2nd. She was lying face-up on the bed, with her skull "bashed in" from at least five blows. One of those blows was to the back of the head. Among other wounds were two broken fingers on her right hand.

Defendant fled the scene in the victim's vehicle. Law enforcement officers later arrested appellant at a motel in North Carolina. There, they found the victim's vehicle, containing appellant's and the victim's cell phones, both of which were turned off. Appellant had in his possession a nearly untraceable pre-paid phone, and a receipt indicating he purchased it in South

Carolina on August 3rd. Appellant's wallet contained a letter from the victim asking him to sign the "divorce papers" so she could "move on with her life" because her marriage to appellant had been a "living hell." The police never recovered the murder weapon or the firearm the victim was alleged to have possessed.

### B. Appellant's Testimony

Appellant was the only living eyewitness as to what took place at the motel on the night of the murder. Appellant stated the victim came to his motel room to discuss a "few issues." The victim undressed to a nightgown and asked appellant for $3,000. Appellant refused to give her the money. Appellant testified the victim was angry and she asked him to get her cigarettes out of her car. He got the cigarettes and when he returned, the victim was sitting on the bed with a blanket over her lap. Appellant testified the victim again asked for the money and when appellant refused to give her money, she moved the blanket back and pointed a gun at appellant. Appellant stated he told the victim he would give her some money and he reached for his bag. Instead, appellant removed a nightstick from the bag. He testified his "mind just collapsed" and he "started hitting her," striking her hand[2] first and knocking the gun out of her hand and onto the floor. Appellant testified that once the gun was out of the victim's hand, he "just . . . lost control" and continued hitting the victim with the nightstick. Appellant testified, "I lost control, you know, cause the only thing that was on my mind [was] that she was going to kill me . . . ." At trial, appellant stated he did not remember how many times he hit the victim, but said that he stopped once he saw she was not moving.

Appellant retrieved the gun, the victim's phone, and his belongings, and he fled in the vehicle the victim drove to the motel. He testified that he discarded both the nightstick and the victim's gun while driving.

---

[2] The evidence did not reveal if the victim was right handed or left handed.

## II. REFUSED JURY INSTRUCTION

When reviewing a trial court's denial of a proffered jury instruction, an appellate court considers the evidence in the light most favorable to the proponent of the jury instruction. Foster v. Commonwealth, 13 Va. App. 380, 383, 412 S.E.2d 198, 200 (1991). We review the trial court's "broad discretion in giving or denying instructions requested" for an abuse of that discretion. Gaines v. Commonwealth, 39 Va. App. 562, 568, 574 S.E.2d 775, 778 (2003) (*en banc*).

An assertion of self-defense by a defendant in a homicide case "implicitly admits the killing was intentional and assumes the burden of introducing evidence of justification or excuse that raises a reasonable doubt in the minds of the jurors." Commonwealth v. Sands, 262 Va. 724, 729, 553 S.E.2d 733, 736 (2001) (quoting McGhee v. Commonwealth, 219 Va. 560, 562, 248 S.E.2d 808, 810 (1978)). It is "well-established . . . that, as with any proffered instruction that is otherwise a correct statement of law, an instruction on the defense of self-defense 'is proper . . . if supported by more than a scintilla of evidence' and 'it is not error to refuse an instruction when there is no evidence to support it.'" Commonwealth v. Cary, 271 Va. 87, 100, 623 S.E.2d 906, 913 (2006) (emphasis omitted) (quoting Sands, 262 Va. at 729, 553 S.E.2d at 736). While a defendant's uncorroborated testimony "may amount to more than a scintilla of evidence when viewed in a vacuum," it often "pales to no more than a scintilla when viewed in light of the other undisputed evidence at trial." Brandau v. Commonwealth, 16 Va. App. 408, 413, 430 S.E.2d 563, 565 (1993).

Viewing the evidence in the light most favorable to appellant, he was not entitled to a self-defense instruction because the degree of force he used was not reasonable in relation to the harm threatened by the victim. An individual's "right to use deadly force in self-defense 'begins where the necessity begins and ends where it ends.'" Couture v. Commonwealth, 51 Va. App.

- 4 -

239, 251, 656 S.E.2d 425, 431 (2008) (quoting Thomason v. Commonwealth, 178 Va. 489, 498, 17 S.E.2d 374, 378 (1941)). Appellant stated he knocked the gun out of the victim's hand with the first strike to the victim's hand. Yet he testified he continued to strike the victim even after she was disarmed, going so far as to admit that he "lost control." Based on appellant's own testimony about his violent attack on the victim even after she no longer held a weapon, we cannot say the trial court abused its discretion in denying a self-defense jury instruction.

Furthermore, even if appellant's testimony regarding the events at the motel "amount[ed] to more than a scintilla of evidence when viewed in a vacuum," it "pales to no more than a scintilla when viewed in light of the other undisputed evidence at trial." Brandau, 16 Va. App. at 413, 430 S.E.2d at 565. The evidence showed the victim was brutally beaten to the point where her skull collapsed. The medical examiner stated there were at least five blows to her head, including one to the back of the head, any one of which could have been lethal. Other evidence showed the victim had filed for a divorce from appellant and was residing with another man. Numerous recorded phone calls indicated that appellant refused to sign the "divorce papers" and was angry that the victim took money from his account. Appellant testified that during the incident, he knocked the gun from the victim's hand, at which point he did not flee, attempt to grab the gun, or testify that the victim lunged for it. Instead, he continued his assault, crushing the victim's skull with numerous blows. After appellant killed the victim, he withdrew cash from a bank account and fled the state. He took the victim's cell phone, and he turned off both his cell phone and the victim's cell phone. He did not go to the police or report the crime. He testified that he threw the victim's gun, plainly a key piece of evidence when claiming self-defense, out of the window of the vehicle when he was traveling. The evidence belies any possible claim that appellant acted in self-defense. Accordingly, the trial court did not err in refusing to give a self-defense instruction.

Appellant assigns error to leading questions posed to Joe Bennett, appellant's "pod mate" at Blue Ridge Regional Jail, during direct examination. The Commonwealth asked the following of Bennett:

1. "[Y]ou sent a note to the guards thinking he was going to kill his wife, so did you believe him at some point?"

2. "Did he specifically say that he would beat the blank out of her so she would feel the pain?"

3. "Did he ever say that his wife was a possession . . . ?"

4. "Did he ever say that he would try and lure his wife somewhere so he could kill her?"

Bennett responded affirmatively to all of these questions. We agree with appellant that these questions were leading. Such error, however, was harmless, as there was sufficient additional evidence to support appellant's conviction.

"Ordinarily, permitting a leading question to be asked is no ground for reversal." Abernathy v. Emporia Mfg. Co., 122 Va. 406, 423, 95 S.E. 418, 423 (1918). "[T]rial courts are clothed with a large discretion in such matters, which this court will not lightly undertake to control . . . ." Flint v. Commonwealth, 114 Va. 820, 823, 76 S.E. 308, 310 (1912). Even when a trial court erroneously permits leading questions, the error will not warrant reversal if it is harmless. In determining whether an error is harmless, we review "the record and the evidence and evaluate the effect the error may have had on how the finder of fact resolved the contested issues." Lavinder v. Commonwealth, 12 Va. App. 1003, 1007, 407 S.E.2d 910, 912 (1991) (*en banc*). Non-constitutional error is harmless "when it plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached." Code § 8.01-678. If other evidence of guilt is so "overwhelming" and the error so insignificant by comparison that we can conclude the error "failed to have any

'substantial influence' on the verdict," United States v. Lane, 474 U.S. 438, 450 (1986) (quoting Kotteakos v. United States, 328 U.S. 750, 765 (1946)), such error is harmless.

Appellant focuses on how the leading questions and Bennett's responses were prejudicial, but does not explain how, if we were to disregard this testimony, the remaining evidence would be insufficient to support his first-degree murder conviction. The remaining evidence indicated not only that appellant committed the murder (as described in Part II), but also that appellant planned and premeditated it. For example, appellant's nephew testified that, during a phone call from jail, appellant had said "he was going to kill [the victim]." The nephew told his family, including the victim, about this threat because he was concerned for the victim's safety. After hearing about appellant's threats, the victim sought a protective order against appellant. This testimony, along with the substantial evidence of motive and appellant's evasive behavior following the murder (to include his testimony that he threw the gun and nightstick out of his car window), undermine his claim that he merely acted in self-defense when he repeatedly struck the victim.[3] Viewed in its entirety, the evidence of guilt was so overwhelming that any error in permitting leading questions was harmless.

## IV. CONCLUSION

The trial court did not err in refusing to provide a self-defense instruction. Any error in permitting the Commonwealth to pose leading questions was harmless. Accordingly, we affirm.

Affirmed.

---

[3] In addition, appellant's own counsel solicited additional evidence of appellant's plan from Bennett. During re-cross examination, counsel asked Bennett if appellant ever mentioned a specific place he would lure his wife. Bennett responded: "He said hotel."