COURT OF APPEALS OF VIRGINIA

Present: Judges Athey, Ortiz and Chaney

WILLIAM VINCENT SCOTT

v.      Record No. 1654-23-1

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
JUDGE DANIEL E. ORTIZ
JULY 16, 2024

FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
Steven C. Frucci, Judge[1]

(Roger A. Whitus; Slipow & Robusto, P.C., on brief), for appellant.

(Jason S. Miyares, Attorney General; Justin B. Hill, Assistant
Attorney General, on brief), for appellee.

A Virginia Beach grand jury indicted William Vincent Scott on two counts of

maliciously shooting at an occupied vehicle, discharging a firearm from a motor vehicle,

unlawful wounding during the commission of a felony, and second-degree murder, in violation

of Code §§ 18.2-154, 18.2-286.1, 18.2-53, and 18.2-32, respectively. A jury then convicted

Scott of discharging a firearm from a motor vehicle, unlawful wounding during the commission

of a felony, and involuntary manslaughter. Scott contends that the trial court erred by granting

the Commonwealth's pretrial motion to exclude certain evidence at trial and in finding the

evidence sufficient to support the convictions. After examining the briefs and record here, the

panel unanimously holds that oral argument is unnecessary because "the appeal is wholly without

merit." Code § 17.1-403(ii)(a); Rule 5A:27(a). Accordingly, we affirm.

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] The Honorable Steven C. Frucci presided over the proceedings below. Now a member of this Court, Judge Frucci took no part in this decision.

BACKGROUND[2]

On January 29, 2022, Kevin Boone ("Kevin") and his wife Darlene Boone ("Darlene") were separated but had not yet begun divorce proceedings. Scott was Darlene's new boyfriend. That evening, Darlene made plans to meet her friend Darren Kerr at a club named Ocean's 11 in Virginia Beach. Darlene called Kerr by his nickname, "D." Scott also decided to meet Darlene at Ocean's 11 that evening, and Kevin separately went to the same club. Kerr was the first to arrive and was given a table in the VIP section. Kevin arrived at 10:06 p.m., and Darlene arrived at 11:29 p.m. Shortly after Darlene arrived, she and Kevin both sat near Kerr at his table. Darlene and Kevin argued with one another.

Scott arrived at 11:49 p.m. After Scott arrived, he walked into the VIP section occupied then by Kerr alone. Scott aggressively slammed his drink on Kerr's table and claimed that the VIP section was reserved for "D," unaware that "D" was Kerr. Kerr, who did not know who Scott was, stood up, and the two of them argued back and forth a few times. Darlene saw the confrontation and rushed over to introduce Kerr and Scott, but the situation had already "escalated." Darlene and Scott then left the VIP section and walked towards the rear of the lounge.

At about 12:11 a.m., Darlene and Kevin were standing at the bar together. The two spoke and Darlene bought Kevin a drink. While they spoke, Kevin placed his arms against the bar and on either side of Darlene. Because the situation appeared tense, Corey White—an owner of the bar who knew both Darlene and Kevin—approached them to see if they were okay and told them to take it easy. Right after that, security at Ocean's 11 asked Kevin, Darlene, and Scott to leave and escorted them out. As they were escorted out, Scott and Kevin "had one or two words" in the

---

[2] "In accordance with familiar principles of appellate review, the facts will be stated in the light most favorable to the Commonwealth, the prevailing party at trial." *Gerald v. Commonwealth*, 295 Va. 469, 472 (2018) (quoting *Scott v. Commonwealth*, 292 Va. 380, 381 (2016)).

lobby. Before security could get in between the two and separate them, Kevin grabbed Scott's necklace and pulled the charm off it. White escorted Kevin out of the club and to his car. As he did, both security and Darlene had to hold Scott back from pursuing Kevin. Darlene, afraid that things would escalate further, screamed at Scott to just "let [Kevin] go, it's not worth it."

Kevin drove away at 12:14 a.m. Meanwhile, security escorted Darlene and Scott to Scott's vehicle. As Kevin drove past, Scott reached into his car and retrieved a firearm; Scott then walked toward Kevin's car as it left. One member of the security staff retrieved mace from the trunk of his own car while Darlene and three other security staff members restrained Scott and escorted him to his vehicle. Scott and Darlene drove away at 12:16 a.m.

Both Kevin and Scott turned onto Oceana Boulevard. Kevin drove a silver Lexus sedan. His vehicle was traveling on Oceana Boulevard and passed through its intersection with Harpers Square at 12:16:27 a.m. At 12:16:56 a.m., a dark SUV drove through the same intersection. A few moments later, at 12:17:06, Scott drove through the intersection at a "high rate of speed" in his silver Mercedes sedan.

Keara Morey was driving the dark SUV between Kevin's and Scott's cars. After the vehicles passed through that intersection and began to pass Oceana Naval Air Station, Morey noticed that Kevin's vehicle was "swerving an exorbitant amount" before veering left through the lanes of oncoming traffic and crashing into a ditch on the far-left side of Oceana Boulevard. Morey called 911 and reported the vehicle as a suspected drunk driver who crashed.

Officer J.W. Knipp was parked approximately a quarter mile north on Oceana Boulevard and was dispatched for the suspected DUI crash. He arrived at 12:22 a.m. and found Kevin's vehicle 20 to 25 feet off the roadway in a snowy embankment. Kevin was slumped over the steering wheel. The front passenger window was rolled down and there were two bullet holes on the right rear quarter panel of his car. When he opened the driver's door, Officer Knipp found a

- 3 -

Glock 23 .40-caliber firearm on the driver's side floorboard, next to Kevin's foot. The magazine had a capacity of 15 rounds and 13 rounds were recovered from it. Emergency medical services arrived at 12:24 a.m. and identified that Kevin had a bullet wound. Kevin was pronounced dead at the scene.

Forensic technician Jake Arnold processed the crime scene and located seven 9mm cartridge casings right before the intersection of Oceana Boulevard and Bells Road. During the ensuing investigation, Virginia Beach detectives also gathered surveillance footage from Ocean's 11 and from a traffic camera located at the intersection of Oceana Boulevard and Harpers Square. The detectives then met with Darlene and, shortly thereafter, received a phone call from Scott's attorney, who provided the location of Scott's vehicle. Officers seized Scott's vehicle and searched it based on a search warrant. Inside, officers located a Sarsilmaz-model 9mm handgun under the driver's seat.

Kevin's autopsy revealed that he died from a single gunshot that entered underneath his jaw on the right side and eventually lodged in his left arm. The bullet hit Kevin's jugular vein, pharynx, and spine before traveling through his pectoral muscle and into his arm. As a result, Kevin died from a combination of blood loss and asphyxiation from the blood running into his lungs. Death was not instantaneous, but occurred in a matter of minutes or less.

Upon further investigation of Kevin's vehicle, police recovered various metal fragments and a deformed bullet from inside the trunk. Police also recovered two cartridge casings from inside the car, one on the floorboard near the passenger seat and one on the floorboard near the rear driver's side door. In Scott's vehicle, officers discovered one bullet hole in the "driver's side, back passenger door" and a bullet fragment in the rear driver's side floorboard. Police recovered three more bullet casings in the channel of the windshield.

Forensic scientist Julianna Red Leaf testified that the seven bullet casings found on Oceana Boulevard and the three bullet casings found in the windshield channel of Scott's vehicle were all fired from the 9mm handgun found in Scott's Mercedes. Forensic testing also demonstrated that the bullet fragment recovered from Kevin's body and the two bullet fragments recovered from the trunk of his vehicle were fired from the 9mm handgun recovered from Scott's vehicle. The two bullet casings found inside Kevin's vehicle were fired from the .40 caliber firearm recovered from his vehicle. Tests on the bullet fragment found in Scott's vehicle were inconclusive, but the rifling pattern matched the firearm located in Kevin's vehicle.

Scott was subsequently indicted on two counts of maliciously shooting at an occupied vehicle, shooting from a motor vehicle, second-degree murder caused by maliciously shooting at an occupied vehicle, and unlawful wounding during the commission of a felony. Before trial, the Commonwealth filed a motion *in limine* to exclude evidence of Kevin's prior non-violent felony and evidence of a protective order issued for Darlene against Kevin. The Commonwealth contended that the felony conviction was not relevant because it was non-violent and could not be used to impeach Kevin unless he testified, which he could not do. The Commonwealth suspected that Scott would attempt to submit the prior conviction to prove that Kevin was prohibited from possessing a firearm. The Commonwealth likewise contended that the allegations underlying the protective order could only be used as evidence of Kevin's propensity for violence if Scott made a prima facie showing of self-defense and that, if Scott did so, only the underlying allegations would be admissible.

Scott responded that both Kevin's felony conviction and the physical protective order were admissible because "just him in the act of having a gun while under a protective order and under a conviction for a felony . . . is something that is inherently violent." The trial court agreed that the allegations underlying the protective order and the existence of the protective order would be

admissible. Even still, it ruled that whether Kevin was prohibited from possessing a firearm was irrelevant and thus excluded evidence that Kevin was a felon as well as the physical copy of the protective order.

At trial, the Commonwealth called Darlene to testify. On cross-examination, Darlene testified that she arrived at Ocean's 11 before Kevin; she said that Scott and Kevin arrived at the same time and she was "surprised that they didn't hold the door for one another." She said that as soon as she saw Kevin, she immediately wanted to leave, and that shortly after Kevin arrived, he pinned her against the bar and "accosted" her while she was trying to close her tab. Darlene added that as soon as she got away, she went to Scott and told him that they needed to leave. She claimed that as they were walking out, security moved them aside because they were throwing Kevin out. She did not see Kevin do anything to Scott by the exit, but she recalled, "that's when [Scott's] whole demeanor changed." Darlene explained that she tried to hold Scott back and pleaded with him that it was not worth it to confront Kevin, and she told Scott that she would get the charm for his necklace back through her and Kevin's daughter.

Darlene said that Scott "was already calm before [they] pulled" out of the parking lot. As they were driving, she tried to call her daughter. Suddenly, Darlene heard a gunshot and saw a spark by the rear driver-side door. She ducked and saw no other gunfire, but she believed Scott was shooting because she heard two different guns. Once it got quiet again, Darlene raised her head and realized they were not on Oceana Boulevard anymore.

Darlene also testified about a protective order that was issued against Kevin. The protective order was issued in April of 2021 and was still active on the night of the offense. Darlene explained that she sought the order after several incidents. First, she claimed that when they were separated but still living in the same house, Kevin "forced himself" on her multiple times. She also said that

- 6 -

while they were separated she and Kevin got into a fight and he pushed her and slammed her on the floor.

During that testimony, Scott's counsel attempted to hand Darlene a copy of the affidavit she submitted when seeking the protective order to refresh her recollection. But Darlene had not testified that she did not recall the allegations in the affidavit. To the contrary, Darlene claimed that she "remember[ed] everything that [she] put in there." Even so, Scott's counsel asserted that use of the affidavit was proper because "she's leaving stuff out." The trial court sustained the Commonwealth's objection, explaining to Scott's counsel that Darlene had "not told you that she doesn't remember what she put in that petition or the reasons for it. You can't use that to refresh a recollection that hasn't been expressed forgotten. . . . [Y]ou're stuck with her answers." When questioning resumed, Scott inquired, "were there any other acts of violence that you mentioned in the protective order that you didn't tell us about here?," and Darlene responded, "I don't recall. Because I don't even know where I left off." Scott did not ask any further questions of Darlene.

On redirect, Darlene acknowledged that she texted Kevin at 12:17 a.m. on the night he was killed regarding the charm from Scott's necklace. She also acknowledged that, despite the protective order, she asked Kevin to pick her up and take her somewhere earlier that day. Although Darlene was shown four pages of text messages, she denied texting with Kevin while in Ocean's 11. She claimed that the timestamps on the text messages were altered.

After the Commonwealth rested, Scott moved to strike the evidence. He argued that Darlene's testimony established, as a matter of law, that Scott returned gunfire in self-defense. The trial court denied the motion, ruling that self-defense was a question for the jury.

Scott called John Cohen, the doorman at Ocean's 11, in his defense. Cohen testified that he helped escort Kevin to his vehicle that evening and then walked to Scott's vehicle. He testified that

- 7 -

he did not see a gun or anything else in Scott's hand. On cross-examination, however, Cohen admitted that he told police on February 4, 2022, that he did see an object in Scott's hand that night.

The jury returned not guilty verdicts for the two charges of maliciously shooting at an occupied vehicle, but it found Scott guilty of shooting from a motor vehicle, unlawful wounding during the commission of a felony, and involuntary manslaughter caused by unlawfully shooting into an occupied vehicle. Scott appeals.

## ANALYSIS

### I. The Protective Order and the Affidavit

Scott asserts that the trial court erred in denying his request to admit the protective order and its underlying affidavit, because they "would tend to establish Kevin's propensity for violence," and because they showed his "aggression was ongoing and unpredictable in nature." He concludes that the trial court's "unnecessarily restrictive ruling undercut [his] ability to present a full and complete self-defense case to the jury." We disagree.

Determining the "'admissibility of evidence is within the discretion of the trial court,' and an appellate court will not reject such decision absent an 'abuse of discretion.'" *Williams v. Commonwealth*, 71 Va. App. 462, 487 (2020) (quoting *Tirado v. Commonwealth*, 296 Va. 15, 26 (2018)). "The abuse of discretion standard draws a line—or rather, demarcates a region—between the unsupportable and the merely mistaken, between the legal error . . . that a reviewing court may always correct, and the simple disagreement that, on this standard, it may not." *Jefferson v. Commonwealth*, 298 Va. 1, 10-11 (2019) (alteration in original) (quoting *Reyes v. Commonwealth*, 297 Va. 133, 139 (2019)). "[T]he abuse of discretion standard requires a reviewing court to show enough deference to a primary decisionmaker's judgment that the [reviewing] court does not reverse merely because it would have come to a different result in the first instance."

- 8 -

*Commonwealth v. Thomas*, 73 Va. App. 121, 127 (2021) (alterations in original) (quoting *Lawlor v. Commonwealth*, 285 Va. 187, 212 (2013)).

We find no abuse of discretion in the trial court's decision. Indeed, Darlene was permitted to testify to the existence of the "no-contact" protective order she obtained against Kevin and the fact that it was active until April 2023. Darlene was also allowed to testify to the facts alleged in support of her protective order. She recalled that Kevin, on several occasions, forced himself on her and that Kevin once attacked her and "slammed [her] on the floor." But Darlene's testimony left out several allegations from her affidavit. And the trial court excluded the physical copies of the protective order and affidavit, finding that the documents were inadmissible hearsay not subject to any exception. On appeal, Scott asserts that this exclusion of several allegations about Kevin's prior violent conduct was error.

Virginia Rules of Evidence 2:801 and 2:802 exclude as hearsay any "written statements which were made out of court and are offered for the truth of what they say." *Arnold v. Wallace*, 283 Va. 709, 713 (2012). Such statements are not admissible unless they fall into a hearsay exception. *See id.* Here, Scott sought to admit Darlene's statements about Kevin's prior violent behavior, made outside of the court in an affidavit to obtain a protective order. Scott argues that such statements were relevant to show that Kevin had a propensity for violence and thus that Scott reasonably feared death or bodily harm on the night Kevin was killed. But the trial court properly found that Darlene's statements—made out of court, and offered to prove that Kevin had indeed engaged in violent conduct, as she asserted—were inadmissible hearsay, unless they were subject to an exception to the hearsay rule. *See id.* And Scott fails to point to a valid exception which would permit the admission of the affidavit and protective order.

Rule 2:801(d)(1) provides that prior *inconsistent* statements of a witness are admissible to impeach witness credibility, but not for the truth of the matter asserted unless another hearsay

exception applies. But Darlene's testimony was not inconsistent with her prior allegations. Thus Scott could not use the affidavit to impeach Darlene's testimony, and the trial court did not abuse its discretion in preventing its use for that purpose. *See* Va. R. Evid. 2:801(d)(1).[3]

Prior written statements may also be used in limited circumstances to refresh the recollection of a witness, though in such cases the written record is not admitted into evidence. *See McGann v. Commonwealth*, 15 Va. App. 448, 451-52 (1992).

> [W]hen a witness has a memory lapse on the stand and "forgets some portion (or even all) of the facts of the matter about which [he or she is] called to testify," a party may attempt to refresh the witness's memory by having the witness examine materials relating to the matter for which they are testifying.

*Ruhlin v. Samaan*, 282 Va. 371, 379 (2011) (second alteration in original) (quoting *McGann*, 15 Va. App. at 451-52). "After examining such materials, a witness may then 'speak to the facts from his own recollection.'" *Id.* (quoting *Harrison v. Middleton*, 52 Va. (11 Gratt.) 527, 544 (1854)).

Here, Darlene testified about two of the allegations in the affidavit—that Kevin forced himself on her multiple times and that he once slammed her head into the ground. Because the affidavit contained additional allegations that Darlene failed to testify to, Scott inquired if she remembered the allegations she made in support of the protective order and she responded, "Yes. It was a lot of stuff that I put in the petition." She later affirmed, "I remember everything that I put in there." At that point, the trial court stated that Scott could not prompt Darlene with the affidavit, as based on her own testimony she "did not have a memory lapse" and was "able to independently recall the facts" in the affidavit. *See McGann*, 15 Va. App. at 452. But then, following a discussion between the trial court and counsel for both parties, Darlene again took the stand for "one last question." When Scott inquired if the protective order contained any allegations that she had not yet

---

[3] The admission of prior inconsistent statements is also subject to certain procedural requirements laid out in Virginia Rule of Evidence 2:613. *See* Va. R. Evid. 2:801(d)(1).

- 10 -

testified about, Darlene responded, "I don't recall. Because I don't even know where I left off. I got—I don't recall." At that point, instead of then using the affidavit to refresh Darlene's recollection, Scott ended his cross-examination, stating, "I'll stop there, Your Honor. I'll stop there." Once Darlene had stated that she did not remember the remaining contents of the affidavit, Scott *could* permissibly have showed it to her to refresh her recollection, at which point Darlene may have testified from her own memory as to the other allegations it contained. But Scott did not attempt to do so, and the record fails to indicate that the trial court prevented him from refreshing Darlene's recollection at that point.

In short, we find no error in the trial court's rulings regarding the protective order and its supporting affidavit.

## II. Sufficiency of the Evidence

Scott also asserts that the evidence was insufficient to support his convictions. Scott does not deny that he fired the shots that killed Kevin, nor does he contend that the evidence failed to prove any particular element of each offense. Scott's sole contention on appeal is that the evidence proved he acted in self-defense and thus that the evidence could not support his convictions. The jury rejected that assertion, and we are bound by the jury's findings.

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting

- 11 -

*Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan*, 72 Va. App. at 521 (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).[4]

"To establish a claim of self-defense, a defendant must show that he reasonably feared death or serious bodily harm at the hands of his victim." *Hines v. Commonwealth*, 292 Va. 674, 679 (2016). "Whether the danger is reasonably apparent is judged from the viewpoint of the defendant at the time of the incident." *Id.* "The defendant must also show that he was in imminent danger of harm, that is, a showing of an overt act or other circumstance that affords an immediate threat to safety." *Id.* The force used must also "be proportional to the threat posed." *Peeples v. Commonwealth*, 30 Va. App. 626, 635 (1999) (en banc). "To justify the use of *deadly* force, the defendant must have reasonably feared death or serious bodily injury from his victim, and there must have been an overt threat." *Id.* at 634 (emphasis added).

"Whether an accused proves circumstances sufficient to create a reasonable doubt that he acted in self-defense is a question of fact." *Bell v. Commonwealth*, 66 Va. App. 479, 486 (2016) (quoting *Smith v. Commonwealth*, 17 Va. App. 68, 71 (1993)). "Self-defense is an affirmative defense . . . , and in making such a plea, a 'defendant . . . assumes the burden of introducing evidence of justification or excuse that raises a reasonable doubt in the minds of the jurors.'"

---

[4] This deferential principle "is not limited solely to matters of witness credibility[;] [w]e [also] owe deference to the trial court's interpretation of all of the evidence, including video evidence that we are able to observe much as the trial court did." *Meade v. Commonwealth*, 74 Va. App. 796, 806 (2022). "Such deference stems not from the trial court being in a superior position to view the video evidence but from the difference in our respective roles." *Id.* Unlike the factfinder, this Court reviews video evidence on appeal "not to determine what we think happened, but for the limited purpose of determining whether any rational factfinder could have viewed it as the [factfinder] did." *Id.*

*Commonwealth v. Sands*, 262 Va. 724, 729 (2001) (quoting *McGhee v. Commonwealth*, 219 Va. 560, 562 (1978)).

"In Virginia . . . self-defense is classified either as justifiable or excusable." *Foote v. Commonwealth*, 11 Va. App. 61, 67 (1990). Justifiable self-defense occurs when "a person, without any fault on his part in provoking or bringing on the difficulty," acts under a reasonable fear of death or serious bodily injury. *Jones v. Commonwealth*, 71 Va. App. 70, 94 (2019) (quoting *Bell*, 66 Va. App. at 487). "If an accused 'is even slightly at fault' in creating the difficulty leading to the necessity to kill, 'the killing is not justifiable.'" *Id.* (quoting *Smith*, 17 Va. App. at 71). "Any form of conduct by the accused from which the fact finder may reasonably infer that the accused contributed to the affray constitutes 'fault.'" *Id.* at 94-95 (quoting *Smith*, 17 Va. App. at 71). Only when a defendant is "free from all fault or wrong-doing" that might have "had the effect" of "bring[ing] on the difficulty" will he be allowed to claim justifiable self-defense. *Bell v. Commonwealth*, 2 Va. App. 48, 56 (1986) (quoting *Sims v. Commonwealth*, 134 Va. 736, 762 (1922)). In contrast, excusable self-defense occurs when "the accused, although in some fault . . . [in] bringing on the difficulty, when attacked retreats as far as possible, announces his desire for peace[,] and [acts] from a reasonably apparent necessity to preserve his own life or save himself from great bodily harm." *Bell*, 66 Va. App. at 487 (quoting *Bailey v. Commonwealth*, 200 Va. 92, 96 (1958)).

Here, the evidence suggests that Scott was aggressive upon arrival at Ocean's 11, confronting Kerr and demanding that he leave the VIP section. Just 25 minutes later, Scott was involved in a confrontation with Kevin as security escorted Kevin out of the building. But no one testified as to who started the confrontation. Darlene said that Kevin took the charm from Scott's necklace, and she had to hold Scott back from pursuing Kevin after security separated the two men. The evidence showed that several security guards needed to monitor the situation.

The video surveillance shows that Kevin was escorted to his vehicle and left peacefully. Yet as Kevin drove past, Scott reached into his car and retrieved a firearm. One member of the security staff felt the need to retrieve mace from the trunk of his own car while Darlene and the other security staff members worked to get Scott into his vehicle. Scott then left Ocean's 11 and pursued Kevin at a high speed. Gunfire rang out as both men started shooting. The forensic evidence did not establish who shot first, but it proved that Kevin fired two rounds while Scott fired at least ten. After being struck by one of those ten rounds, Kevin's car veered across the highway, through opposing lanes of traffic, and crashed on the shoulder. Scott did not call 911 to report the crash or to explain that he acted in self-defense. Instead, he fled the scene.

Viewed in totality, a jury could have reasonably concluded that Scott was the primary aggressor. Given the absence of evidence about who started the confrontation in the club, the jury could only speculate as to whether Scott had started the events that ultimately turned deadly. Yet even if Kevin began the altercation and took Scott's necklace, that action could not reasonably have caused Scott to fear physical injury or death. *See Peeples*, 30 Va. App. at 635. Further, any purported danger to Scott or Darlene was averted when Kevin left the club. There was no evidence that Kevin sought them out or waited for them to catch up, or that he in any way presented any further threat to them. Rather, the evidence showed that Scott, after grabbing his firearm, pursued Kevin at a high speed and fired several shots at his vehicle, killing him. Any necessity to use self-defense after Kevin left the club arose from Scott's own misconduct. He was at very least "slightly at fault," barring a finding of justifiable self-defense. *See Jones*, 71 Va. App. at 94. The jury could also infer consciousness of guilt, and thus guilt, from Scott's flight from the scene. *See Jones v. Commonwealth*, 279 Va. 52, 58 (2010). Thus, the jury's finding that Scott's actions were not justifiable self-defense was not plainly wrong or without evidence to support it. We leave that finding undisturbed.

Scott's actions were also not excusable. First, the jury could reject Darlene's testimony that Kevin fired the first shots. Darlene's testimony diverged from the events and timeline depicted in the video surveillance, and it was discredited by other witnesses who saw her interacting with Kevin in the bar that night. The video surveillance also refutes her testimony that Scott was "already calmed down" before they pulled out of the parking lot, and four pages of text messages rebutted her denial that she communicated with Kevin via text while in Ocean's 11. Given all the inconsistencies in her testimony, the jury was not plainly wrong in rejecting, if it did, her account of who fired first.[5] "The fact finder, who has the opportunity to see and hear the witnesses, has the sole responsibility to determine their credibility, the weight to be given their testimony, and the inferences to be drawn from proven facts." *Commonwealth v. McNeal*, 282 Va. 16, 22 (2011) (quoting *Commonwealth v. Taylor*, 256 Va. 514, 518 (1998)).

Even if Kevin did fire his weapon first, however, the evidence failed to show that Scott, clearly at some fault in the incident, retreated as far as possible from the situation or otherwise indicated his desire for peace. *See Bell*, 66 Va. App. at 487. Indeed, nothing prohibited Scott from slowing or stopping his vehicle or from calling 911. But even under Darlene's version of events, when fired upon—after catching up to Kevin at a high speed—Scott returned fire, shooting at least ten times in Kevin's direction. The jury's finding that Scott's actions were not excusable is not plainly wrong. The assertion that Scott was responding to an overt threat or otherwise operating under a fear of death or serious bodily injury is simply not supported by the record. *See Peeples*, 30 Va. App. at 634. The record more readily shows that he willingly caused and participated in the entire exchange.

---

[5] We note that the jury acquitted Scott of shooting into an occupied vehicle and of second-degree murder, both of which required proof of malice, which may suggest that the jury, in fact, found that Kevin fired his weapon first.

- 15 -

Accordingly, the trial court did not err in finding the evidence sufficient to support Scott's convictions where the evidence failed to show that he acted in justifiable or excusable self-defense. Because the jury's findings of fact are supported by the record and not plainly wrong or without evidence to support them, we affirm the verdicts.

## CONCLUSION

Because the trial court did not erroneously exclude hearsay statements about the victim's alleged prior misconduct, and the evidence supports the jury's finding that Scott did not act in self-defense, we affirm Scott's convictions for shooting from a vehicle, unlawfully wounding another in the commission of a felony, and involuntary manslaughter.

*Affirmed.*