UNPUBLISHED

# COURT OF APPEALS OF VIRGINIA

Present:   Judges Malveaux, Friedman and Lorish
Argued at Alexandria, Virginia


FURQAN SYED

                                                    MEMORANDUM OPINION* BY
v.        Record No. 1334-23-4                      JUDGE LISA M. LORISH
                                                    NOVEMBER 6, 2024

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF LOUDOUN COUNTY
Douglas L. Fleming, Jr., Judge

Joseph D. King (King, Campbell, Poretz & Mitchell PLLC, on
briefs), for appellant.

Matthew J. Beyrau, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Furqan Syed challenges his convictions for first-degree murder, breaking and entering with

the intent to commit a felony, and using a firearm in the commission of a felony. He argues that the

trial court erred in admitting several pieces of evidence: a statement he made to the police,

testimony from a co-conspirator, cell phone records, and surveillance camera video footage. He

also contends the trial court erred in granting a jury instruction on concert of action. We find no

error and affirm the trial court's judgment.

---

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

The murder of Chemlali-Goode

Alexander Amir Abbas (Alexander) lived with his mother, Najat Chemlali-Goode, in an Ashburn townhouse. His sister, Sheima Abbas (Sheima), also lived at the townhouse when she was not away at college. While home alone on December 27, 2021, Sheima answered the doorbell to find a man she did not know, but later identified as Syed. Syed was wearing a dark "puffer jacket." He asked if "brother Amir" was home. Sheima thought the stranger's reference to her brother as "Amir" was peculiar because that was Alexander's middle name, and typically only family members knew him as Amir. Not wanting to reveal that she was home alone, Sheima asked the man for his name. Syed did not answer and instead asked if Amir still worked at the "mobile" store.[2] Sheima asked him for his name again. He paused, giving her an "empty smile" that did not "reach his eyes or anything," and told her that his name was "Syed." Sheima told Syed she would tell her brother that he had stopped by. Syed said, "[N]o, [i]t's okay. I'll be back soon," and then left. Unnerved by the encounter, Sheima immediately called Alexander and Chemlali-Goode to tell them what had happened. She later described the individual as having a Pakistani accent and brown-stained teeth.

Three days later, on the morning of December 30, Alexander had a brief conversation with Chemlali-Goode before leaving for work, while Sheima was also at home before heading back to college in Philadelphia. When he returned home around 8:00 p.m. that evening, Alexander found Chemlali-Goode shot to death in the hallway just inside the front door. She was shot in the cheek and in the back, and had a graze gunshot wound in her scalp.

---

[1] On appeal, "we review the evidence in the 'light most favorable' to the Commonwealth." *Clanton v. Commonwealth*, 53 Va. App. 561, 564 (2009) (en banc) (quoting *Commonwealth v. Hudson*, 265 Va. 505, 514 (2003)).

[2] Alexander worked at an electronics repair shop.

The police develop Syed as a suspect

The police found two bullet holes in the wall near Chemlali-Goode's body and a third hole in the floor. The townhouse had three doors on the first floor that provided access to the exterior: the front door, Alexander's usually locked bedroom door that led to the backyard, and a door that opened to the garage. The first-floor doors leading to the garage and from Alexander's room to the backyard were ajar. A hose extended through the garage door, preventing it from closing. According to Alexander, neither door was open when he left for work that morning. In addition, the gate to the backyard stood open, although it was typically closed. There was no sign of forced entry to the home.

The police concluded that the murder occurred around 7:30 p.m. One of Chemlali-Goode's neighbors heard three "loud bangs" consistent with gunshots at about 7:25 p.m., while another neighbor heard three "popping" sounds like gunshots at about 7:30 p.m.

The police reviewed surveillance camera footage from neighboring homes that captured activity in the area from three days earlier, when Syed came by the house and spoke to Sheima. The footage showed a silver Toyota Camry moving through the townhouse community around that same time. The vehicle had an EZ Pass transponder on the dashboard, an object hanging from the rear-view mirror, and an extra sticker on the windshield. The Camry had a Virginia license plate, and the last character of the plate number was "6."

After canvassing the neighborhood, Detective Tonmy Rodriguez recovered additional surveillance footage that depicted "a tall skinny male" wearing dark clothing and a "puffy" jacket walk onto Chemlali-Goode's driveway at 7:28 p.m. This "same subject" could be seen in the footage from three days prior when Syed visited the home. Detective Rodriguez saw the man approach Chemlali-Goode's home and stand at the door. Just two days before the murder, footage showed the same man on the street "looking towards Ms. Chemlali-Goode's residence and pac[ing]

back and forth." Detective Rodriguez testified that the person he saw on all three days had the same distinctive gait and kept his hands in his jacket pockets.

Based on this evidence, Detective Rodriguez obtained a search warrant for a "cell tower dump" for all towers within a one-mile radius of the murder. Syed's cell phone number had "multiple connection hits" for cell towers around Chemlali-Goode's home between 6:50 p.m. and 7:45 p.m. on the night of the killing.

The police then got a search warrant for Syed's apartment in Leesburg, in addition to a silver Toyota Camry that was parked outside the building. The car was not only similar in appearance to the vehicle in the surveillance footage, but it also had a Virginia license plate number VTS-1096, an EZ Pass transponder, and an extra sticker on the windshield. In the car, the police found a receipt for a cash deposit totaling $4,130 to Syed's Bank of America account the day before the murder.

Analysis of the cell site records revealed that Syed's phone was in close physical proximity to Abdul Waheed's phone between December 27 and December 30. Both phones were near Chemlali-Goode's home on each of the four days. Both phones appeared to be at a Harris Teeter store near the crime scene between 6:50 p.m. and 7:10 p.m. on the night of the killing. Syed's phone produced no location data or communication between 7:10 p.m. to 7:37 p.m. that night, suggesting the phone could have been turned off or in airplane mode. But the records showed Waheed's phone was near Chemlali-Goode's home at 7:29 p.m. on December 30. By 7:34 p.m., Waheed's phone had traveled back to the location near Harris Teeter.

Besides living at the same apartment complex, Syed and Waheed both belonged to a religious organization called Messiah Foundation International (MFI). Chemlali-Goode's sister was also a member of MFI and was married to the leader of the organization, Younus AlGohar. Her sister lived in the United Kingdom and would stay with Chemlali-Goode when she visited the

United States. While Chemlali-Goode and her children were not members of MFI, members—including Syed—would visit and stay with her while they were visiting the United States. Alexander explained at trial that he knew Syed from these visits and that Syed knew him as "Amir" because that was what his aunt called him.

The police also got a warrant to search Syed's brother's apartment and seized a cell phone. They also found a dark-colored "puffy style" jacket with stripes on the sleeves, like the one the reported suspect had worn.

Syed leaves the country and is arrested abroad

Cell phone records showed that, beginning at about 12:30 a.m. on December 31, 2021, Syed's phone moved west until it reached St. Louis, Missouri. Evidence showed that Syed stayed at a hotel in St. Louis from December 31, 2021, to January 1, 2022.

After returning to Virginia from St. Louis, Syed's brother took him to Dulles Airport on January 3. Records from United Airlines confirmed that Syed flew to Frankfurt, Germany, and then to Dubai. Syed's plane ticket had a return date of January 30.

During the search of Syed's apartment on January 6, the police took a cell phone from Syed's wife. Syed's wife said that he was in the United Arab Emirates. Based on this information, Detective Rodriguez obtained a "Red Notice" authorizing Syed's arrest through international law enforcement.

Using an extraction tool, the police examined the content of the seized cell phone. On December 31, 2021, during Syed's trip to St. Louis, the phone was used to search the internet for local news in the Ashburn area and for the meaning of "homicide."

Federal marshals arrested Syed abroad and brought him back to the United States in March 2022. Detective Rodriguez took Syed to the Loudoun County Sheriff's Office, placed him in an

interview room, and read him his *Miranda*[3] rights. The police officers confirmed Syed's identity and residence and that he owned the silver Toyota Camry they had searched outside his home. When Detective Rodriguez asked if Syed knew why he had been arrested, he replied that it was "over a murder." He said that his wife sent him a news article about a murder. Syed then said he wanted to talk to his lawyer before making any more statements, and the interview ended.

Syed filled out paperwork before a magistrate and the officers served him with warrants. During the booking process, Detective Rodriguez ordered that Waheed, who had also been arrested, be kept separate from Syed. While waiting for deputies to transport Syed to the Adult Detention Center, the officer "chitchat[ted]" with Syed. Detective Rodriguez asked Syed if he knew why his friend, meaning Waheed, was there. Syed said, "[B]ecause he drove me."[4] Syed did not move to suppress this statement before trial.

A jury convicted Syed of first-degree murder, breaking and entering with the intent to commit a felony, and using a firearm in the commission of a felony.[5] The trial court sentenced Syed to life plus 38 years of imprisonment.

ANALYSIS

I. Admission of Syed's Statement

For the first time, in the middle of trial, Syed objected to the introduction of his statement, "[B]ecause he drove me." Syed maintains that the police obtained the statement in violation of his Fifth Amendment rights and the rule in *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981), that if

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[4] At Waheed's trial for conspiracy to commit murder, the trial court granted a defense motion to strike and dismissed the charge.

[5] The trial court granted Syed's motion to strike a charge of conspiracy to commit murder.

- 6 -

a suspect requests counsel during custodial police interrogation, the questioning must cease until an attorney is provided for him.[6]

Under Code § 19.2-266.2(A) and (B), defense motions or objections seeking the suppression of evidence on grounds that it was obtained in violation of the Fifth or Sixth Amendments "shall be raised in writing, before trial." Such motion or objection "shall be filed . . . not later than seven days before trial." Code § 19.2-266.2(B). "The circuit court may, however, for good cause shown and in the interest of justice, permit the motions or objections to be raised at a later time." *Id.* "Failure to follow this statutory requirement results in a waiver of an accused's constitutional challenge to the admissibility of the evidence." *Arrington v. Commonwealth*, 53 Va. App. 635, 640 (2009) (quoting *Magruder v. Commonwealth*, 275 Va. 283, 300 (2008)). "The filing and notice requirements of Code § 19.2-266.2 '"serve[] legitimate state interests in protecting against surprise, harassment, and undue delay."'" *Id.* (alteration in original) (quoting *Magruder*, 275 Va. at 300). In addition, "[t]he justification for the requirement of a pretrial suppression motion is readily apparent in light of the Commonwealth's limited right to appeal an adverse suppression ruling." *Upchurch v. Commonwealth*, 31 Va. App. 48, 53 (1999).

Syed concedes that he did not comply with Code § 19.2-266.2 to seek suppression of his statement, but he claims that defense counsel "faithfully believed that the prosecutor would not attempt to use an unconstitutionally gained statement and hence he did not file a pretrial suppression motion." Thus, Syed contends that his surprise at the prosecutor's attempt to

---

[6] If a suspect waives his right to an attorney after he has received *Miranda* warnings, the police "are free to interrogate him, but if the suspect requests counsel at any time during the interrogation, the interrogation must cease until an attorney has been made available to the suspect or the suspect reinitiates the interrogation." *Bass v. Commonwealth*, 70 Va. App. 522, 540 (2019) (quoting *Commonwealth v. Redmond*, 264 Va. 321, 328 (2002)).

introduce such evidence amounts to good cause for his failure to file a pretrial motion to suppress.

"We utilize an abuse of discretion standard when reviewing the trial judge's denial of appellant's motion to consider the suppression motion after the statutory deadline." *Upchurch*, 31 Va. App. at 52. Here, the Commonwealth disclosed Syed's statement to the defense approximately a year before trial. Nothing suggested that the Commonwealth misled Syed or prevented him from "discovering relevant facts" relating to his statement. *Id.* We reject Syed's argument that an attorney's subjective surprise, without more, constitutes "good cause shown." Thus, we find no abuse of discretion in the trial court's determination that there was no good cause to excuse Syed's failure to comply with Code § 19.2-266.2 and in denying his midtrial motion to suppress.[7]

II. Admission of Waheed's Testimony

The parties questioned Waheed extensively out of the jury's presence, anticipating that he would invoke his Fifth Amendment right against self-incrimination when the Commonwealth called him as a witness. As expected, Waheed invoked his Fifth Amendment right against self-incrimination in response to most of the prosecutor's substantive questions. But when the prosecutor asked if he killed Chemlali-Goode, Waheed said, "Not at all." Defense counsel then asked Waheed to confirm that Syed had "nothing to do with" Chemlali-Goode's death. He responded, "Nothing such happened in my, in front of me." The Commonwealth argued that because Waheed did not invoke the Fifth Amendment in response to these two questions, it should

---

[7] Having reached this conclusion, we need not consider the Commonwealth's assertion that Syed also waived this issue under Rule 5A:18 because his argument at trial was that the police obtained the statement in violation of his Sixth Amendment right to counsel rather than his Fifth Amendment rights and the rule of *Edwards*. *See Harvey v. Commonwealth*, 65 Va. App. 280, 285 n.2 (2015) (noting that on appeal, we resolve issues on the "narrowest and best ground").

be able to ask him those same questions in front of the jury. Syed's counsel objected, arguing that it would provide "an incomplete picture of his testimony." The trial court ruled that Waheed could testify before the jury to any of the limited questions to which he had not invoked his privilege.

After further discussion about Waheed's testimony, the trial court ruled that it could not compel the defense to ask Waheed the same question during the trial (confirming Syed was not involved in the killing) that counsel had asked outside the jury's presence. The court ruled that the Commonwealth could ask Waheed the two questions for which he had not asserted the privilege and that Syed's counsel would have the opportunity for cross-examination. At trial, Waheed's answer to the second question—that Syed was not involved in the killing—differed from what he provided outside the jury's presence. Instead, Waheed responded, "To my knowledge, no." The Commonwealth then tried to impeach Waheed based on the response he had given the day before. Waheed agreed that he said "[n]othing such happened in my, in front of me" and that "[n]o such thing happened in front of me." Syed's counsel then declined the opportunity to cross-examine Waheed in front of the jury.

Syed argues on appeal that the trial court "improperly immunized" Waheed from cross-examination when it "admitt[ed] into evidence select testimony of an alleged co-conspirator" who had "declined to answer numerous other questions posed to him." He claims that the trial court deprived him of his Sixth Amendment right to confront the evidence when it allowed the Commonwealth to ask Waheed the two questions for which he did not invoke his privilege not to testify. But at no point did Syed proffer any questions that he claims the trial court should have permitted him to ask Waheed, nor did he proffer Waheed's responses. Syed also never argued that Waheed's willingness to answer questions about one subject meant he was not unavailable for these other unidentified questions he wanted to ask.

"In Virginia, when 'testimony is rejected before it is delivered, an appellate court has no basis for adjudication unless the record reflects a proper proffer.'" *Ray v. Commonwealth*, 55 Va. App. 647, 649 (2010) (quoting *Whittaker v. Commonwealth*, 217 Va. 966, 968 (1977)). "When an appellant claims a trial court abused its discretion in excluding evidence, we cannot competently determine error—much less reversible error—without 'a proper showing of what that testimony would have been.'" *Id.* (quoting *Tynes v. Commonwealth*, 49 Va. App. 17, 21 (2006)). For this Court to consider whether the trial judge erroneously limited the defendant's examination of a witness, the record must contain a proffer of both the questions the defendant wanted to ask and the answers the witness would have given. *See id.* at 649-50. When there is not a proper proffer, "as long as the trial court does not prohibit counsel from proffering the necessary evidence for the record, we will not disturb the court's ruling on appeal." *Cortez-Hernandez v. Commonwealth*, 58 Va. App. 66, 77-78 (2011).

Without any proffer of the evidence Syed claims was improperly excluded, we cannot say the court erred by limiting Waheed's testimony to the subject matter for which he did not invoke his privilege against self-incrimination.

III.  Admission of Verizon Cell Site Records

Next, Syed contends that the trial court abused its discretion by admitting Verizon's "cell tower dump" records from the time of the murder and records relating to his phone. In his assignment of error, he claims that the trial court erred in admitting the records "over defense counsel's foundation objection."

On the third day of trial, the Commonwealth called Selvin Cardoza, a Verizon employee, as a witness. The Commonwealth moved for admission of Verizon records under the business records exception to the hearsay rule, Virginia Rule of Evidence 2:803(6). When the Commonwealth asked Cardoza to identify records from the "tower dump," he responded that he had only become involved

in the case the day before and had not yet reviewed them in detail. Cardoza said he was not familiar with either the certificates of authenticity from Verizon or the individuals who certify records on the company's behalf. The trial court then adjourned the proceedings for the day.

When the trial resumed the following morning, the Commonwealth explained that the Verizon representative originally scheduled to certify the "tower dump" records had sustained a death in the family, so Cardoza had stepped in to authenticate the records. After Cardoza reviewed the records overnight, he was able to certify that Verizon maintained the records in the ordinary course of business and created them at or near the pertinent time of the matters reflected in them.

Syed objected to admission of the records for insufficient foundation. The trial court found that the records qualified as business records for admission under Rule 2:803(6) but required the Commonwealth to develop more evidence to support their authenticity. Cardoza then testified that Verizon assigned an identification number to any request for records from a law enforcement agency. Cardoza verified that the unique number assigned to Syed's case matched Verizon's number relating to the "tower dump" records that the Commonwealth sought to admit at trial. After these developments, the trial court overruled Syed's objection to the records.

"On appeal, this Court 'reviews a trial court's ruling admitting or excluding evidence for abuse of discretion.'" *Church v. Commonwealth*, 71 Va. App. 107, 122 (2019) (quoting *Payne v. Commonwealth*, 292 Va. 855, 866 (2016)). "Only when reasonable jurists could not differ can we say an abuse of discretion has occurred." *Thomas v. Commonwealth*, 44 Va. App. 741, 753, *adopted upon reh'g en banc*, 45 Va. App. 811 (2005). "The measure of the burden of proof with respect to factual questions underlying the admissibility of evidence is proof by a preponderance of the evidence." *Church*, 71 Va. App. at 122 (quoting *Atkins v. Commonwealth*, 68 Va. App. 1, 9 (2017)).

"The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the thing in question is what its proponent claims." Va. R. Evid. 2:901. "[A]uthentication does not set a high barrier to admissibility, and is generally satisfied by any form of proof that supports a finding that it is what it purports to be." *Atkins*, 68 Va. App. at 9 (alteration in original) (quoting Charles E. Friend & Kent Sinclair, *The Law of Evidence in Virginia* § 17-1, at 1164 (7th ed. 2012)). "Further, it is well established that '[t]he completeness of the identification goes to the weight' afforded 'the evidence rather than its admissibility,' with the responsibility of determining the threshold question of admissibility resting with the trial court." *Id.* (alteration in original) (quoting *Armes v. Commonwealth*, 3 Va. App. 189, 193 (1986)).

Although Cardoza admitted unfamiliarity with the Verizon records when first called as a witness, he had the opportunity to review them further overnight. He determined that Verizon kept the records in the ordinary course of business and that they were the same records produced in response to law enforcement's request. Because Cardoza's testimony was sufficient to establish that the Verizon records were admissible under the business record exception and that they were authentic, the trial court did not abuse its discretion in admitting them.

IV. Admission of Surveillance Camera Footage

Syed contends that the trial court erred in admitting surveillance footage and still photographs from the devices on the exterior of the home of Carmen Toledo, one of Chemlali-Goode's neighbors.[8]

---

[8] Within his assignment of error concerning the admission of video during Detective Rodriguez's testimony, Syed claims that the trial court erred in overruling his objection on chain of custody grounds. Syed's argument on this assignment of error contains no legal authority to support his claim concerning the chain of custody. Rule 5A:20(e) requires an opening brief to contain "[t]he standard of review and the argument (including principles of law and authorities) relating to each assignment of error." "We require adherence to this rule because '[a] court of

Toledo had four surveillance cameras installed outside her home. At the time of the killing, Toledo was in Mexico. She provided the police with her username, password, and authentication code to allow them to view the recordings from her home's cameras that had been uploaded and stored on her Ring account.

Toledo then testified that still photographs from the videos recorded on December 27 through December 30, 2021, accurately reflected the views from her front door and her garage. She reviewed the videos either while she was still in Mexico or after her return, and she did not alter or manipulate them. Syed objected to the photo and video evidence on the grounds that Toledo lacked personal knowledge and for a lack of foundation. During Toledo's testimony, the trial court admitted still photos and a video from her surveillance cameras of the motor vehicle and pedestrian activity in Chemlali-Goode's neighborhood on the afternoons of December 29, 2021, December 27, 2021, and December 28, 2021.

After Toledo was excused as a witness, the prosecutor discovered that the video introduced as Exhibit 64C was recorded on December 27, 2021, and thus was not the source for the still photographs introduced as Exhibits 64A and 64B, which were from December 28, 2021. The Commonwealth recalled Detective Rodriguez and introduced Exhibit 64D, the actual video Toledo's camera recorded on December 28, 2021. Detective Rodriguez confirmed that the source for the photographs in 64A and 64B was the video admitted as 64D.

---

review is entitled to have the issues clearly defined and to be cited pertinent authority. The appellate court is not a depository in which the appellant may dump the burden of argument and research.'" *Bartley v. Commonwealth*, 67 Va. App. 740, 744 (2017) (alteration in original) (quoting *Jones v. Commonwealth*, 51 Va. App. 730, 734 (2008)). "To ignore such a rule by addressing the case on the merits would require this court to be an advocate for, as well as the judge of the correctness of, [appellant's] position on the issues he raises." *Id.* (alteration in original) (quoting *Jones*, 51 Va. App. at 734-35). Because Syed failed to develop his chain of custody argument, we do not consider it here.

Virginia law recognizes two theories of admissibility for photos and video recordings: "'to illustrate a witness' testimony' or 'as an "independent silent witness" of matters revealed by the [recording].'" *Bennett v. Commonwealth*, 69 Va. App. 475, 487 (2018) (quoting *Bailey v. Commonwealth*, 259 Va. 723, 738 (2000)). Under either theory, the video must first be authenticated. Authentication is "a condition precedent to [the] admissibility" of evidence and is satisfied only by "evidence sufficient to support a finding that the thing in question is what its proponent claims." Va. R. Evid. 2:901. "Before asking the court to admit a videotape into evidence, . . . the party offering it must authenticate it . . . ." *Brooks v. Commonwealth*, 15 Va. App. 407, 410 (1992).

Toledo identified the photographs and videos from those dates as made by her surveillance cameras. She viewed the videos that were stored online by her Ring security system either while she was in Mexico or after her return, and provided the police with the necessary information so that they could access the materials as well. No evidence suggested that Toledo or the police altered or manipulated any of the photos or videos. Moreover, Detective Rodriguez sufficiently authenticated Exhibit 64D as the source for the still photographs from December 28, 2021, even though it was not introduced during Toledo's testimony. Under these circumstances, we find no abuse of discretion in the trial court's decision to admit the photos and videos from Toledo's surveillance cameras.

V. Jury Instruction on Concert of Action

Over Syed's objection, the trial court granted Instruction 24, which stated:

> If there is concert of action with the resulting crime one of its incidental probable consequences, then whether such crime was originally contemplated or not, all who participate in any way in bringing it about are equally answerable and bound by the acts of every other person connected with the consummation of such resulting crime.

Syed does not assert that this instruction was an incorrect statement of law, but he contends that the trial court erred in granting this jury instruction on concert of action for two reasons. First, he argues that there was no basis for the instruction if the statement "because he drove me" would have been suppressed. But this argument fails because we concluded that the trial court did not abuse its discretion in refusing to exclude Syed's statement at trial. Next, Syed argues that the trial court should have excluded the concert of action instruction for the same reasons it granted his motion to strike the conspiracy count, and because the instruction conflicted with the Commonwealth's primary theory of the case.

"As a general rule, the matter of granting and denying instructions . . . rest[s] in the sound discretion of the trial court." *Dandridge v. Commonwealth*, 72 Va. App. 669, 679 (2021) (alterations in original) (quoting *Lienau v. Commonwealth*, 69 Va. App. 254, 263 (2018)). "The trial court's 'broad discretion in giving or denying instructions requested' is reviewed for an abuse of discretion." *Id.* (quoting *King v. Commonwealth*, 64 Va. App. 580, 586 (2015) (en banc)). "Our sole responsibility in reviewing [jury instructions] is to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises." *Pena Pinedo v. Commonwealth*, 300 Va. 116, 121 (2021) (alteration in original) (quoting *Cooper v. Commonwealth*, 277 Va. 377, 381 (2009)). "[A]n instruction is proper only if supported by more than a scintilla of evidence." *Avent v. Commonwealth*, 279 Va. 175, 202 (2010) (quoting *Commonwealth v. Sands*, 262 Va. 724, 729 (2001)).

Even if the trial court erred in granting the concert of action instruction, we will not reverse if the error was harmless. "The United States Supreme Court has repeatedly stated that harmless error analysis is appropriate in the context of improper jury instructions." *Conley v. Commonwealth*, 74 Va. App. 658, 684 (2022) (quoting *Kil v. Commonwealth*, 12 Va. App. 802, 812 (1991)). "Thus, '[w]here a reviewing court can find that the record developed at trial

establishes guilt beyond a reasonable doubt, the interest in fairness has been satisfied and the judgment should be affirmed.'" *Id.* (alteration in original) (quoting *Kil*, 12 Va. App. at 812).

Uncontroverted evidence supports the trial court's decision to admit the instruction. Three days before the murder, Syed visited Chemlali-Goode's home and asked for Alexander. He told Sheima that he would be "back soon," and surveillance footage confirmed that Syed was in Chemlali-Goode's neighborhood in the days before the killing. Most significantly, Syed approached the townhouse around the time the shots were fired and then fled after the shooting, first traveling to St. Louis, and then to Dubai. In the days after the killing, Syed allegedly searched the internet for local news from Ashburn and for the meaning of "homicide." Lastly, when the police asked if Syed knew why Waheed would have been arrested, he said it was "because he drove me," implying that Waheed drove Syed to the crime scene. This theory was supported by the cell phone evidence placing Waheed's and Syed's phones together before and after the killing, in addition to evidence that Waheed's phone traveled to the crime scene. These circumstances were sufficient for a factfinder to conclude, beyond a reasonable doubt, that Syed was the person who entered Chemlali-Goode's home and shot her. Thus, any possible error in granting the concert of action instruction was harmless.

## CONCLUSION

For these reasons, we affirm the trial court's judgment.

*Affirmed.*