UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present: Judges Beales, Fulton and Friedman
Argued at Norfolk, Virginia


PRESTON KYLE THOMAS

MEMORANDUM OPINION* BY
v.      Record No. 1914-23-1          JUDGE JUNIUS P. FULTON, III
                                                        JUNE 17, 2025
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF ISLE OF WIGHT COUNTY
Westbrook J. Parker, Judge Designate

Lauren Brice, Assistant Public Defender (Virginia Indigent Defense
Commission, on briefs), for appellant.

William K. Hamilton, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Following a jury trial, Preston Kyle Thomas was convicted of voluntary manslaughter.[1]  By

order entered October 11, 2023, the trial court sentenced Thomas to ten years' incarceration.  On

appeal, Thomas challenges the trial court's refusal of a proposed jury instruction regarding

self-defense where the defendant is without fault.[2]  Finding no error, we affirm the trial court.

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] Thomas was tried on charges of first-degree murder and the use of a firearm in the
commission of a felony.  The jury instead convicted Thomas of the lesser-included offense of
voluntary manslaughter and acquitted him on the use of a firearm charge.

[2] The proposed jury instruction at issue read:

If you believe that the defendant was without fault in provoking or
bringing on the fight or difficulty and you further believe that:

(1) he reasonably feared, under the circumstances as they appeared
to him, that he was in imminent danger of being killed or that
he was in imminent danger of great bodily harm; and

BACKGROUND

On September 23, 2021, Preston Thomas was working at Safeco Products in Windsor, Virginia. Rakim Breeden and his girlfriend, Belinda Hall, were also working at Safeco Products that day. It was Breeden's and Hall's first day working at Safeco Products.

After lunch, Thomas and Breeden were unloading a truck together and Thomas played music from his cellphone while they worked. While telling another coworker a story, Breeden accidentally struck Thomas's phone with a pallet jack, cracking it. Breeden apologized to Thomas. After Thomas then asked Breeden to pay for the phone, a verbal altercation ensued.

Hall was working in another part of the facility at the time but was alerted to the conflict. When she arrived at Thomas and Breeden's location, she saw them "in each other's faces" "fussing" at each other. She then asked what was happening, and Thomas said, "your goofy boyfriend broke my phone." Hall offered to pay for the phone, but Thomas "kept on saying stuff to [Breeden]." At trial, Hall testified that Thomas appeared "really, really, really pissed." Hall repeated that she would pay for the phone, but Breeden told her that she "ain't giving him no money" and "look how he's disrespecting me." At some point during this verbal altercation, Thomas seemingly threatened both Hall and Breeden by saying "somebody is going to pay for my phone or you-all are going to find out at 4:00 when we leave here." After Hall told Thomas she would pay for the phone, Thomas pointed his finger at her, almost touching her nose, and said, "bitch, you ain't got nothing to do with this." It was at that point that Breeden pushed Hall aside and, as she testified at trial, "[Breeden and Thomas] started fist fighting."

---

(2) he used no more force, under the circumstances as they appeared to him, than was reasonably necessary to protect himself from the perceived harm,

then the killing was in self-defense, and you shall find the defendant not guilty.

Breeden took his shirt off and punched Thomas.  Breeden struck Thomas one time, using only his fist.  Thomas staggered from the blow but did not fall before walking away.  Breeden followed Thomas briefly in the warehouse, then returned to the work area and put his shirt back on.  Thomas then walked outside to his car.

Thomas got into his car, and after a few moments, started returning to the building.  He walked just to the building's entrance, then immediately turned around and walked back to his car.  About 30 seconds later, Breeden and other coworkers went outside for their 2:15 p.m. break.  Roughly a minute and a half passed in total between when Thomas initially walked out to the parking lot after the first altercation with Breeden, and when Breeden walked out to the parking lot immediately prior to Thomas and Breeden re-engaging in a verbal and physical conflict.

However, before Breeden and other coworkers exited the building, Thomas testified that he got to his car the second time, reached inside to "grab the gun from the glovebox," and then stood outside of it for a few seconds before walking towards Breeden, who was now walking toward the parking lot. [3]  Thomas testified that, at this time, Breeden was yelling at him, calling him a "bitch," and saying that he was going to "beat the shit out of" him.  The men began "circling one another" in the parking lot, each taking turns advancing toward and moving away from the other.

The video from the parking lot shows Thomas taking steps toward Breeden, while Breeden backs up.  Thomas then suddenly gestured with the top of his body towards Breeden before quickly pulling back.  After this initial physically aggressive action by Thomas, Breeden

_____

[3] Thomas testified that he did not retrieve the gun from the car the first time he went to it and retrieved it from the glovebox when he returned to the car, but the surveillance video seemingly negates this testimony.  Thomas later admitted on cross-examination that he lied about the gun being in the car's glovebox as it was actually under the driver's seat.

- 3 -

responded by immediately charging at Thomas and Thomas testified that, at this point, he pulled his gun from his pants to show Breeden that he was armed. Thomas testified that Breeden was yelling that he was going to kill Thomas during this time. Breeden began moving backwards once Thomas pulled the gun, and Thomas put it back in his pocket.

Thomas testified that after he put the gun away, Breeden continued threatening him, saying he would "break [his] neck," and telling Thomas that he did not know "who [he] was fucking with." Breeden then began to turn away from Thomas but turned back around when Thomas advanced towards him. Breeden turned away from Thomas a second time and began walking back toward the building. The video from the parking lot then shows Breeden making a backwards gesture towards Thomas, seemingly "waving him off," but when Thomas followed closely behind Breeden, Breeden turned and faced him. Thomas testified that Breeden continued to verbally threaten him, telling him that he "better pull that shit" while he had the chance.

Breeden then took his hands out of his pockets and made a sudden gesture forward, which Thomas characterized as a "lunge," towards him. Thomas immediately stepped back, pulled the gun out again, and began firing at Breeden. As Breeden turned away from Thomas and attempted to flee toward the building, Thomas continued firing. Thomas fired nine times and struck Breeden six times. Breeden stumbled back inside the warehouse where he ultimately succumbed to his gunshot wounds.

Several other Safeco Products employees who were present on the day of the incident testified at trial. Jerry Holly testified that he saw "two guys fussing and arguing," before Thomas pulled out the gun and began firing. Another employee, Eddie Tilley, testified that he heard some of the exchange between Thomas and Breeden, but could not see Breeden from his vantage point. He could hear Thomas say, "where's my money. I want my money now," and a second voice respond, "pull that shit." Tilley heard gunfire seconds later.

Breeden's autopsy indicated that he was 5'5" tall and weighed 205 pounds. Dr. Nicole Maisan performed the autopsy and determined that Breeden had gunshot wounds in both arms as well as his torso, hip, buttocks, and left thigh. She opined that at least two of the bullets entered from the rear of his body and one from the front and that each shot contributed to his death via blood loss.

Thomas was the sole witness for the defense, testifying that he was 5'6" or 5'7" and that he weighed 115 pounds. He further testified that he initially had no issues with Breeden or Hall. When he initially overheard Breeden telling another coworker about his favorite boxer and that he loved to box and "how he be knocking people out," it did not scare him or make him concerned about Breeden. Thomas also acknowledged he knew Breeden was unarmed at the time he began firing and that he fled the scene, remaining a fugitive for approximately seven months before turning himself in.

Thomas requested three jury instructions on self-defense: the general definition; self-defense when the defendant has some fault in initiating the conflict ("excusable self-defense); and self-defense when the defendant is not at fault in initiating the conflict ("justifiable self-defense"). The trial court instructed the jury on excusable self-defense and the general definition of self-defense but determined that the evidence established that Thomas had some fault in bringing about the conflict and subsequently denied Thomas's Instruction "22B" on justifiable self-defense.[4] Thomas now appeals.

_____

[4] The excusable self-defense instruction given to the jury read:

> If you believe that the defendant was to some degree at fault in provoking or bringing on the fight or difficulty, but you further believe that:
>
> > (1) he retreated as far as he safely could under the circumstances in a good faith attempt to abandon the fight; and

ANALYSIS

"As a general rule, the matter of granting and denying instructions . . . rest[s] in the sound discretion of the trial court." *Cooper v. Commonwealth*, 277 Va. 377, 381 (2009). For this reason, "[t]he trial court's 'broad discretion in giving or denying instructions requested' is reviewed for an abuse of discretion." *Witherow v. Commonwealth*, 65 Va. App. 557, 565 (2015) (quoting *Gaines v. Commonwealth*, 39 Va. App. 562, 568 (2003) (en banc)). "When reviewing a trial court's refusal to give a proffered jury instruction, we view the evidence in the light most favorable to the proponent of the instruction." *Commonwealth v. Vaughn*, 263 Va. 31, 33 (2002).

"Instructions are to be read in connection with the evidence to which they are intended to apply." *Chapman v. Commonwealth*, 56 Va. App. 725, 736 (2010) (quoting *Carroll v. Hutchison*, 172 Va. 43, 52 (1939)). "A defendant is entitled to have the jury instructed only on those theories of the case that are supported by evidence." *Eaton v. Commonwealth*, 240 Va. 236, 255 (1990) (quoting *Frye v. Commonwealth*, 231 Va. 370, 388 (1986)). "Although an instruction correctly states the law, if it is not applicable to the facts and circumstances of the case, it should not be given. An instruction must be supported by *more than* a scintilla of evidence." *Woolridge v. Commonwealth*, 29 Va. App. 339, 348 (1999) (emphasis added) (quoting *Hatcher v. Commonwealth*, 218 Va. 811, 813-14 (1978)); *see Buchanan v.*

---

(2) he made known his desire for peace by word or act; and
(3) he reasonably feared, under the circumstances as they appeared to him, that he was in imminent danger of being killed or that he was in imminent danger of great bodily harm; and
(4) he used no more force, under the circumstances as they appeared to him, than was reasonably necessary to protect himself from the perceived harm,

then the killing was in self-defense, and you shall find the defendant not guilty.

*Commonwealth*, 238 Va. 389, 412 (1989) (holding that the trial court did not err in denying a jury instruction for a lesser-included offense where the defendant "relie[d] on but a scintilla of evidence to support his motion for [the lesser-included] instruction"). "'[T]he weight of the credible evidence that will amount to more than a mere scintilla . . . is a matter to be resolved on a case-by-case basis' by assessing the evidence in support of a proposition against the 'other credible evidence that negates' it." *Woolridge*, 29 Va. App. at 348 (alterations in original) (quoting *Brandau v. Commonwealth*, 16 Va. App. 408, 411-12 (1993)). "[I]t is not error to refuse an instruction when there is no evidence to support it." *Williams v. Commonwealth*, 64 Va. App. 240, 247 (2015) (quoting *Commonwealth v. Sands*, 262 Va. 724, 729 (2001)).

"Self-defense is an affirmative defense to a charge of murder, and in making such a plea, a 'defendant implicitly admits the killing was intentional and assumes the burden of introducing evidence of justification or excuse that raises a reasonable doubt in the minds of the jurors.'" *Sands*, 262 Va. at 729 (quoting *McGhee v. Commonwealth*, 219 Va. 560, 562 (1978)). "The law of self-defense is the law of necessity, and the necessity relied upon must not arise out of [the] defendant's own misconduct." *Hughes v. Commonwealth*, 39 Va. App. 448, 464 (2002). One's right to self-defense "begins where the necessity begins and ends where it ends," and further, "the amount of force used to defend oneself must not be excessive and must be reasonable in relation to the perceived threat." *Couture v. Commonwealth*, 51 Va. App. 239, 251 (2008); *Foster v. Commonwealth*, 13 Va. App. 380, 383 (1991).

"Virginia law recognizes two forms of self-defense to criminal acts of violence: self-defense without fault ('justifiable self-defense') and self-defense with fault ('excusable self-defense')." *Bell v. Commonwealth*, 66 Va. App. 479, 487 (2016). "Justifiable homicide in self-defense occurs where a person, without any fault on his part in provoking or bringing on the

difficulty, kills another under reasonable apprehension of death or great bodily harm to himself." *Id.* (quoting *Bailey v. Commonwealth*, 200 Va. 92, 96 (1958)).

> Excusable homicide in self-defense occurs where the accused, although in some fault in the first instance in provoking or bringing on the difficulty, when attacked retreats as far as possible, announces his desire for peace, and kills his adversary from a reasonably apparent necessity to preserve his own life or save himself from great bodily harm.

*Cortez-Hernandez v. Commonwealth*, 58 Va. App. 66, 81 (2011) (quoting *Bailey*, 200 Va. at 96). "Justifiable self-defense differs from excusable self-defense because it does not necessitate that a defendant retreat and make known his desire for peace, two requirements of excusable self-defense." *Bell*, 66 Va. App. at 487. However, if a defendant "is even slightly at fault" in creating the conflict that leads to the killing, including "any form of conduct on the part of [the defendant]" that may be reasonably viewed as "contribut[ing] to an [altercation]," his use of force is not justifiable self-defense. *Perricllia v. Commonwealth*, 229 Va. 85, 94 (1985); *Bell v. Commonwealth*, 2 Va. App. 48, 58 (1986).

It is undisputed that after Breeden cracked Thomas's phone screen, an altercation erupted between Breeden and Thomas about Breeden compensating Thomas for the damage. After Breeden punched Thomas, Thomas left the building and went out to his car. Thomas testified that he did not think it was "that serious" at the time, and even walked past Safeco Products supervisors on his way out of the building but chose not to report the incident to his supervisors or law enforcement. However, Thomas claimed that once he saw Breeden walking toward him in the parking lot, he retrieved the loaded gun from his car. The record contains no evidence that Breeden walked outside with ill intentions as Breeden did not immediately follow Thomas out of the building, and by all credible accounts, he and his other coworkers only went outside because

it was time for their break.[5]  The record does show that about a minute and a half elapsed after Thomas initially left the warehouse following the initial altercation with Breeden and when Breeden exited the warehouse immediately before the two re-engaged in the conflict in the parking lot.

"The threat to use deadly force by brandishing a weapon has long been considered an assault" and "permitting one to threaten to use deadly force leads in dangerous progression to an unacceptable conclusion."  *Commonwealth v. Alexander*, 260 Va. 238, 241, 242 (2000) (citing *Harper v. Commonwealth*, 196 Va. 723, 733 (1955)).  The circumstances of this case provide ample support for that maxim.  Though Breeden punched Thomas inside the building and the two re-engaged in a verbal altercation once outside the building, the record does not establish more than a scintilla of evidence to suggest that Thomas was without fault "even slightly" and thus entitled to the justifiable self-defense instruction he offered.  Nor does the evidence support the conclusion that Thomas had a right to escalate the verbal altercation by making physically aggressive gestures and then threatening deadly force by showing Breeden the gun.  In fact, Thomas even admitted at trial that the presence of the gun caused Breeden to become "more aggressive" and that, after seeing the gun, Breeden went from threatening to "beat the shit out of [Thomas]," to threatening to kill him.  Ultimately, Thomas's actions, including the presentation of the gun caused the hostilities to progress until they led to Breeden's death.

By Thomas's own admissions at trial, he knew that Breeden was unarmed and that Breeden had not threatened to do anything besides "hit him" prior to Thomas retrieving the gun and concealing it in his pocket.  Nor had Breeden immediately followed Thomas outside after the first altercation.  His testimony further established that he intended to use the gun to simply scare

---

[5] As to the credibility of these accounts, we note that that was a determination made by the factfinder below, and not by this Court.  *See Lucas v. Commonwealth*, 75 Va. App. 334 (2022).

Breeden, not to necessarily ward off another physical attack by Breeden. In *Jordan v. Commonwealth*, 219 Va. 852, 855 (1979), the Supreme Court noted that the defendant's choice to leave a "place of safety," then confront an unarmed victim led to the "inescapable" conclusion that the defendant there "regarded the gun with which he was armed as the 'equalizer' between himself and [the victim], a larger man." Though Breeden was almost 100 pounds heavier than Thomas, the men were roughly the same height, and Breeden had only punched Thomas once during the initial altercation. After that, both men went their separate ways. Subsequently, Thomas, now armed with a concealed firearm and knowing that Breeden was unarmed, left the "safety" of his car to re-engage with Breeden. Thomas knew that the two had only exchanged verbal "jabs" with each other in the parking lot before Thomas pulled the gun to "scare Breeden." As the verbal altercation escalated between them, Thomas pulled out his gun and began firing the gun even as Breeden turned to flee, striking Breeden six times, including at least twice in the back as Breeden fled back to the warehouse.

The uncontested evidence at trial established that Thomas was at least "slightly at fault" in creating the conflict that led to Breeden's killing. Even if the initial conflict between Thomas and Breeden was initiated by Breeden, there was a period of time where the men went their separate ways before Thomas re-engaged and ultimately escalated the conflict with Breeden outside the building. Therefore, we certainly cannot say that the trial court erred in denying Thomas's proposed jury instruction on justifiable self-defense.

## CONCLUSION

For the foregoing reasons, we affirm the trial court's denial of Thomas's proposed justifiable self-defense jury instruction, and we do not disturb Thomas's conviction.

*Affirmed.*